[Cite as *Universal Steel Bldgs. Corp. v. Dues*, 2024-Ohio-698.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MERCER COUNTY

UNIVERSAL STEEL BUILDINGS CORP.,
DBA OLYMPIA STEEL BUILDINGS
CORPORATION,                                              CASE NO. 10-22-07

    PLAINTIFF-APPELLEE/
    CROSS-APPELLANT,

    v.

DANIEL DUES, ET AL.,                                      **O P I N I O N**

    DEFENDANTS-APPELLANTS/
    CROSS-APPELLEES.

**Appeal from Mercer County Common Pleas Court**
**Civil Division**
**Trial Court No. 17-CV-083**

**Judgment Affirmed in Part, Reversed in Part, and Cause Remanded**

**Date of Decision:  February 26, 2024**

**APPEARANCES:**

    *Terrence G. Stolly and Connor W. Kinsey* **for Appellants/**
    **Cross-Appellees**

    *Richard Schroeter, Jr.* **for Appellee/Cross-Appellant**

**ZIMMERMAN, J.**

{¶1} Defendants-appellants/cross-appellees, Daniel Dues ("Daniel") and Denise Dues ("Denise"), appeal the judgment of the Mercer County Court of Common Pleas denying their motion for judgment notwithstanding the verdict ("JNOV") as well as the judgment of the Mercer County Court of Common Pleas granting plaintiff-appellee/cross-appellant's, Universal Steel Buildings Corporation, dba Olympia Steel Buildings ("Universal Steel"), motions for JNOV and directed verdict. Universal Steel appeals the judgments of the Mercer County Court of Common Pleas granting the Dues family's motion for a jury trial, entering judgment on the jury's verdict, and denying its motion for attorney fees. For the reasons that follow, we affirm in part and reverse in part.

*Background*

{¶2} This case stems from July 3, 2014 and October 7, 2016 contracts between Daniel and Universal Steel for the design and fabrication of a steel barn to be constructed on the Dues family's dairy farm located at 4212 Siegrist-Jutte Road in Coldwater, Ohio ("4212 property") for $267,000.00.[1] Daniel and Denise own and operate the dairy farm with their sons, Kyle Dues ("Kyle") and Craig Dues ("Craig") (together, "the Dues sons") (collectively, "the Dues family"). Daniel and

---

[1] At the time that the dairy-barn project commenced, the Irene and Virgil Dues Trust owned the 4212 property. Later, the 4212 property transferred to Kyle and Craig Dues.

Denise reside at an adjacent parcel, located at 4300 Siegrist-Jutte Road in Coldwater, Ohio ("4300 property").[2]

**{¶3}** Universal Steel, a Pennsylvania company, sells pre-engineered steel buildings. Specifically, Universal Steel "produces pre-engineered design drawings for the steel components based upon a customer's request." (Appellee's/Cross-Appellant's Brief at 1). Since Universal Steel does not offer construction or installation services—including the design or installation of foundations for its pre-engineered steel buildings—a customer must hire a third party to design a foundation that will conform to Universal Steel's pre-engineered design.

**{¶4}** In this case, the Dues family intended to construct a barn on the site of their dairy farm at the 4212 property "to facilitate manure and methane management through a flush system and specifically designed roof." (Appellant's/Cross-Appellee's Brief at 3). The Dues family was motivated to construct the barn under the United States Department of Agriculture's ("USDA") Natural Resources Conservation Service's ("NRCS") Environmental Quality Incentive Program ("EQIP"), which incentivizes agricultural producers to address natural-resource concerns, including manure-management incentives. Here, the Dues family intended to "export manure out of the facility" as well as construct "a sloping floor, so that the liquid manure * * * can be flushed down to the lagoon * * * so [they]

---

[2] Daniel and Denise own the 4300 property.

didn't have to run a skid loader in there every day to scrape out the aisles." (July 26-29, 2022 Tr., Vol. II, at 369).

{¶5} Daniel executed the first contract with Universal Steel on July 3, 2014 for an initial set of construction drawings and paid Universal Steel a $10,000.00 engineering deposit.[3] (*See* Doc. No. 10, Ex. 1). Importantly, that contract "identified the location and heights of the framed doors." (Appellant's/Cross-Appellee's Brief at 3).

{¶6} Ultimately, Daniel executed a new contract on October 7, 2016 with Universal Steel and "paid the manufacturing deposit in the amount of $90,125.00 * * * ."[4] (*Id.* at 5). (*See* Doc. No. 10, Ex. 2). Significantly, the new contract specified that the barn would feature "one 10x10 foot, four 12x10 foot, one 14x14 foot, and two 20x14 foot framed door openings." (Appellant's/Cross-Appellee's Brief at 5).

{¶7} Thereafter, the parties executed multiple change orders to the original contract. The first change orders were executed in October and November 2016 to modify "the column locations" and "the baseplates on interior columns * * * ." (July 26-29, 2022 Tr., Vol. I, at 112-113). (*See also* Doc. No. 144). More specifically, the November 2016 change order "changed the bolt pattern and interior baseplates"—that is, the change order changed the design "from a four-bolt bolt-down to a two-bolt" pattern. (July 26-29, 2022 Tr., Vol. II, at 274). That change

---

[3] Even though Kyle's name appears on the contract, Daniel executed the contract.
[4] Daniel paid Universal Steel "a $17,000.00 deposit for the steel building materials" on May 17, 2017. (Doc. No. 10). (*See* Doc. No. 10, Ex. 3).

order also changed the design of the roof from "an 18-inch opening on the top of the roof [to] 32 inches." (*Id.* at 275). Signifcantly, the change order did not alter the height of the door openings.

{¶8} Prior to beginning construction of the barn, Daniel executed a contract with Ann Rethman ("Rethman") of Rethman Design Inc. to design "the concrete load bearing capacity," including "determining weight restrictions, and designing the foundation in accordance with Universal's design." (Appellant's/Cross-Appellee's Brief at 4-5). Rethman provided Daniel with design plans, which not only conformed to Universal Steel's plans but also complied with the EQIP guidelines. Importantly, Rethman's design plans required that the perimeter wall foundations (or piers) to be built at a specific height "[a]bove finish floor" to comply with USDA's NRDC regulations to qualify for EQIP funding. (July 26-29, 2022 Tr., Vol. II, at 316). Specifically, Rethman's design plans required the perimeter-wall foundations to be 71.25 inches tall.

{¶9} Later, Daniel hired A&J Framing and Concrete, LLC ("A&J Framing")—an Amish construction company from Indiana—to perform the foundation and concrete work and to erect the barn. However, while performing the foundation and concrete work, A&J Framing mistakenly poured the concrete columns (located in the southwest corner of the barn) two and three-quarter inches shorter than depicted in the design. To compensate for the error, Daniel executed another change order in February 2017, which changed "13 columns' length by two

and three quarter inches, because [A&J Framing measured in] tenths instead of inches." (July 26-29, 2022 Tr. Vol. II, at 277). (*See* Plaintiff's Ex. 7). Specifically, the parties agreed "to add two and three quarter inches [of steel] to the length of the columns on the left end wall, and add frame lines," and they agreed that Daniel did "not want stamped drawings reflecting these changes." (July 26-29, 2022 Tr., Vol. I, at 121-122).

{¶10} In June 2017, Sukup Steel Structures, LLC ("Sukup"), the company with which Universal Steel contracted to fabricate the barn's components, began delivery of the materials (in six shipments) to the Dues family's 4212 property. The parties agreed for Daniel and the Dues sons to unload the materials, inventory the pieces, and report any deficiencies. At that time, the remaining balance on the contract was approximately $166,000.00, which the parties agreed to split into five payments of $29,000.00 and to be paid by cashier's or certified check. Notwithstanding the parties' agreement to "provide the Dues forty-eight hours' notice of the delivery of the shipments for the materials," Daniel and the Dues sons were not provided such notice. Consequently, Daniel was unable to provide certified checks to Universal Steel. (Doc. No. 10). Therefore, Daniel provided personal checks for the first three shipments of materials.[5] However, Daniel refused further payment to Universal Steel because he and the Dues sons determined that

---

[5] Denise signed the checks.

the fourth delivery was missing approximately 6,000 pounds of materials (which Universal Steel disputes). Lacking reassurance from Universal Steel that it would provide the missing materials, Daniel stopped payment on his personal checks for the first three shipments of materials.

{¶11} Ultimately, the barn was constructed *without* one 14-by-14 foot door opening and *without* two 20-by-14 foot door openings as specified in the contract. Nevertheless, the Dues family was able to correct the deficiency for one of the 20-by-14 foot door openings—the south-facing opening. However, the Dues family was unable to correct the deficiency of the opening located at the northeast portion of the barn because the roof was "too short." (July 26-29, 2022 Tr., Vol. III, at 472). According to Kyle, they were unable to correct the deficiency because "[t]he roof [is] too low" and "[t]here is no way to, * * * without completely tearing that whole part of the building down, and cobbling it up, there [is] no way to correct that." (July 26-29, 2022 Tr., Vol. II, at 384). Consequently, that opening is "[n]ot quite" 12-feet tall. (July 26-29, 2022 Tr., Vol. III, at 472).

{¶12} Even though the Dues family was able to correct a portion of the deficiencies, the barn does not appear as it was designed—that is, the Dues family was required to lift the canopy on the south side of the barn by "4 feet, and [they] had to jerry-rig the ends to match the other roof sloping down." (*Id.* at 473). More importantly, the Dues family is unable to use the barn as intended. Specifically, the Dues family has not been able to use the "flush system" because "the banks" would

not lend the Dues family the money to purchase "the plumbing equipment for the flush system." (*Id.* at 378). Likewise, the Dues family has been unable to export "the solid or dry manure" because they cannot "drive a semi in to load it" since "the building was not built correctly." (*Id.*).

{¶13} Because Universal Steel did not receive full payment for the barn, it filed a mechanic's lien. The mechanic's lien, however, was placed on the Dues family's *4300 property*. Thereafter, on September 13, 2017, Universal Steel filed a complaint in the trial court alleging claims for breach of contract, unjust enrichment, and fraud against Daniel and Denise, and a claim for foreclosure of the mechanic's lien against Daniel, Denise, and Farm Credit Services of Mid-America, FLCA ("Farm Credit"). On October 16, 2017, Daniel and Denise filed their answer along with counterclaims for a declaration of a defective mechanic's lien, slander of title, breach of contract, fraud, and misrepresentation. Farm Credit filed its answer on October 23, 2017. Universal Steel filed its answer to Daniel and Denise's counterclaims on November 13, 2017.

{¶14} That same day, Universal Steel filed an amended complaint adding the Dues sons as parties to the case and alleging claims for unjust enrichment against the Dues sons. On November 21, 2017, the Dues family filed their answer to Universal Steel's amended complaint. Farm Credit filed its answer to Universal Steel's amended complaint on November 30, 2017.

**{¶15}** On June 15, 2018, Universal Steel filed a motion for leave to file a second amended complaint instanter, which the trial court granted on February 22, 2019, and Universal Steel's second amended complaint was filed that day. In its second amended complaint, Universal Steel requested attorney fees and amended its damages request from $149,875.00 to $166,875.00. The Dues family filed their answer to Universal Steel's second amended complaint on February 26, 2019. Farm Credit filed its answer to Universal Steel's second amended complaint on March 1, 2019.

**{¶16}** On June 18, 2018, the Dues family filed a motion requesting a jury trial under Civ.R. 39(B). Universal Steel filed a memorandum in opposition to the Dues family's motion for a jury trial on June 28, 2018, arguing that the parties agreed "to waive any right to a trial by jury in regard to" their October 7, 2016 agreement. (Doc. No. 60). On June 29, 2018, the Dues family filed their reply to Universal Steel's memorandum in opposition to their motion for a jury trial, arguing that "any waiver of jury trial provision contained [in the parties' agreement] is ineffective" because Universal Steel "waived its right to enforce the provision within which the waiver of the jury trial provision is contained." (Doc. No. 61). On July 11, 2018, Universal Steel filed a motion for leave to file a reply in support of its memorandum in opposition to the Dues family's motion for a jury trial instanter, which the Dues family opposed.

{¶17} On January 31, 2020, Universal Steel filed a "supplemental" memorandum in opposition to the Dues family's motion for a jury trial, arguing that the Dues family's motion for a jury trial was not timely under Civ.R. 38. The Dues family filed a reply to Universal Steel's "supplemental" memorandum in opposition to their motion for a jury trial on February 13, 2020. On February 21, 2020, the trial court granted the Dues family's motion for a jury trial after concluding that Daniel did not knowingly, intelligently, or voluntarily waive the right to demand a jury trial in the parties' agreement. Further, the trial court determined that its "discretionary power to order a jury trial under Civ.R. 39(B) to be moot" since the second amended complaint raised "new issues by increasing the amount of the prayer." (Doc. No. 188).

{¶18} On August 10, 2018, Daniel filed a motion for leave to file a third-party complaint instanter. The trial court granted Daniel's motion for leave on August 13, 2018, and the third-party complaint was filed that same day. In his third-party complaint, Daniel alleged claims for breach of contract, failure to perform in a workmanlike manner, and fraudulent misrepresentation against A&J Framing, John Graber ("John"), and Jonas Graber ("Jonas") (collectively, "third-party defendants"). The third-party defendants filed their answer on October 10, 2018. However, on February 8, 2019, Daniel dismissed his third-party complaint against the third-party defendants without prejudice. Prior to dismissing his third-party complaint, Daniel deposed John, Jonas, and John Hilty ("Hilty"), an employee of

A&J Framing and foreman for the Dues family's project, on July 31, 2018. Following dismissal of Daniel's third-party complaint, the parties notified the trial court "that with the dismissal of third party defendants, no depositions were deemed necessary by any of the remaining parties." (Doc. No. 111).

{¶19} On July 24, 2019, Daniel and Denise filed a motion for leave to file amended counterclaims, which the trial court granted the next day. Consequently, Daniel and Denise filed their amended counterclaims on July 29, 2019 in which they alleged claims for a declaration of a defective mechanic's lien, slander of title, breach of contract, tortious interference with a contract and business relations, and misrepresentation against Universal Steel. Relevantly, Daniel and Denise requested, in relevant part, to be awarded punitive damages. Universal Steel filed its answer to Daniel and Denise's amended counterclaims on August 13, 2019.

*The Dues Family and Farm Credit's Motion for Summary Judgment*

{¶20} On September 16, 2019, the Dues family and Farm Credit filed a motion for summary judgment as to Universal Steel's claim for forclosure of a mechanic's lien. After being granted leave, Universal Steel filed a memorandum in opposition to the Dues family and Farm Credit's motion for summary judgment on October 22, 2019. The Dues family and Farm Credit filed their reply to Universal Steel's memorandum in opposition to their motion for summary judgment on October 31, 2019. On April 24, 2020, the trial court granted the Dues family and Farm Credit's motion for summary judgment after concluding that "Farm Credit's

first and second mortgages and its security interest [are] superior liens to the lien of [Universal Steel] on the subject real estate and fixtures thereon." (Doc. No. 205). Based on its request, the trial court dismissed Farm Credit as a party to the case on June 1, 2020.

*The Dues Family's Motion for Summary Judgment*

**{¶21}** Also on September 16, 2019, the Dues family filed a motion for summary judgment, arguing that

> [t]here is no dispute of law or material fact that Universal cannot maintain its Unjust Enrichment, Foreclosure, and Fraud claims and that the Dues are entitled to a Declaration that Universal's Mechanics' [sic] Lien is defective and that Universal has and continues to tortuously interfere with their business and contractual relations with their bank, [Farm Credit].

(Doc. No. 135). Universal Steel filed a memorandum in opposition to the Dues family's motion for summary judgment on October 8, 2019. The Dues family filed their reply to Universal Steel's memorandum in opposition to their motion for summary judgment on October 21, 2019.

**{¶22}** On April 29, 2020, the trial court granted summary judgment in favor of Daniel and Denise as to Universal Steel's claims for foreclosure of the mechanic's lien and unjust enrichment against Denise. Further, the trial court granted summary judgment in favor of Daniel and Denise as to their counterclaim for declaration of a defective mechanic's lien. Finally, the trial court denied summary judgment in favor of the Dues family as to Universal Steel's unjust-

enrichment claims against the Dues sons and Universal Steel's fraud claim against Daniel and Denise as well as Daniel and Denise's counterclaim for tortious interference with a contract and business relations.[6]

*Universal Steel's Motion for Summary Judgment*

**{¶23}** On September 17, 2019, Universal Steel filed a motion for summary judgment, arguing that "there are no genuine issues of material fact related to [its] claims for breach of contract against Daniel Dues, or unjust enrichment against Kyle and Craig Dues." (Doc. No. 142). Further, Universal Steel argued that there are no genuine issues of material fact as to its claim for foreclosure of the mechanic's lien against Daniel and Denise or as to Daniel and Denise's counterclaims. The Dues family filed a memorandum in opposition to Universal Steel's motion for summary judgment on October 7, 2019. On October 22, 2019, Universal Steel filed its reply to the Dues family's memorandum in opposition to its motion for summary judgment.

**{¶24}** On April 29, 2020, the trial court granted summary judgment in favor of Universal Steel as to Daniel and Denise's slander-of-title counterclaim but denied summary judgment in favor of Universal Steel as to Daniel and Denise's counterclaim for tortious interference with a contract and business relations. The trial court further denied summary judgment in favor of Universal Steel as to its

---

[6] Based on Universal Steel's request, the trial court dismissed its breach-of-contract claim against Denise and its unjust-enrichment claim against Daniel with prejudice.

breach-of-contract claim against Daniel and unjust-enrichment claims against the Dues sons.

**{¶25}** On June 24, 2020, the Dues family filed a motion for sanctions against Universal Steel since it had "been on notice, at least since May 2, 2018 that their purported lien was subordinate to two mortgages held by Farm Credit and was filed on the wrong property," and "despite being put on notice of the long-standing rules of lien priority and the fact that the lien was filed on the wrong property, [Universal Steel] refused, willfully, to stipulate to Farm Credit's lien priority." (Doc. No. 227). Importantly, the Dues family alleged that "the refusal and continuous litigation related to the lien and its priority required Farm Credit to enter into two separate loan restructuring agreements with the Dues and resulted in Farm Credit's attorney fees in the amount of $9,751.39 being charged to the Dues." (*Id.*). That same day, Universal Steel filed a memorandum in opposition to the Dues family's motion for sanctions. On July 2, 2020, the Dues family filed a reply to Universal Steel's memorandum in opposition to their motion for sanctions.

**{¶26}** Following a hearing on August 7 and 21, 2020, the trial court denied the Dues family's motion for sanctions on August 27, 2020. Specifically, the trial court concluded that Universal Steel's conduct was not "frivolous in refusing to stipulate to Farm Credit's priority" because Universal Steel "was under no obligation to enter into the requested stipulation of priority." (Doc. No. 256).

-14-

**{¶27}** On July 29, 2021, Universal Steel filed a motion in limine, requesting that the trial court prohibit the Dues family from introducing evidence "of alleged consequential damages resulting from [its] alleged breach of contract" at trial. (Doc. No. 286). The Dues family filed a memorandum in opposition to Universal Steel's motion in limine on August 13, 2021. On August 19, 2021, Universal Steel filed its reply to the Dues family's memorandum in opposition to its motion in limine. The trial court granted Universal Steel's motion in limine on September 9, 2021 since the Dues family did not plead that the contract was unconscionable as a defense.

**{¶28}** Consequently, on October 5, 2021, the Dues family filed a motion for leave to amend their answer to Universal Steel's second amended complaint to add a defense that the contract was unconscionable. Universal Steel filed a memorandum in opposition to the Dues family's motion for leave to amend their answer to its second amended complaint and the Dues family filed a reply to Universal Steel's memorandum in opposition. The trial court granted the Dues family's motion for leave on November 1, 2021 and their amended answer was filed instanter. Because of the Dues family's amended answer, the trial court reconsidered its decision to limit the Dues family from presenting evidence of consequential damages at trial. After an evidentiary hearing on December 6, 2021, the trial court on December 10, 2021 denied Universal Steel's request to limit the Dues family from presenting such evidence.

{¶29} On January 14, 2022, Universal Steel filed a motion to "bifurcate [Daniel and Denise's] punitive damages [counter]claim from the compensatory damages claim within the action," which the trial court granted that same day. (Doc. No. 320). Also that day, Universal Steel filed motions in limine requesting that the trial court prohibit the Dues family from introducing "the alleged cost to modify the barn in order to provide larger door openings" or evidence relating to the "mechanic's lien" at trial. (Doc. Nos. 321, 322). The Dues family filed memoranda in opposition to Universal Steel's motions in limine on January 21, 2022. Universal Steel filed its replies to the Dues family's memoranda in opposition to its motions in limine on January 25, 2022. On February 7, 2022, the trial court denied Universal Steel's motions in limine.

{¶30} Also on January 21, 2022, the Dues family filed a motion regarding Universal Steel's request for attorney fees, arguing that "[b]ecause Paragraph 20 [of the parties' contract] has been waived by [Universal Steel] and struck down once already, and because waiver is a fact driven issue, the jury must decide whether [Universal Steel] has waived its right to seek attorneys [sic] fees." (Doc. No. 328). On January 24, 2022, Universal Steel filed a memorandum in opposition to the Dues family's motion regarding its request for attorney fees. On February 7, 2022, the trial court concluded that Universal Steel's "claim for attorney fees to be a matter for the court in determining whether there is a basis for the claim and to the amount, if any, to be awarded." (Doc. No. 348). As a result, following the jury trial, the

Dues family filed a memorandum in opposition to Universal Steel's request for attorney fees on August 29, 2022.

{¶31} On January 28, 2022, the Dues family filed a motion in limine requesting that the trial court exclude evidence of settlement negotiations under Evid.R. 408, 402 and 403. Universal Steel filed a memorandum in opposition to the Dues family's motion in limine on February 17, 2022. On May 12, 2022, the trial court granted (in part) the Dues family's motion in limine.

*Jury Trial*

{¶32} The case proceeded to a jury trial on July 26-29, 2022. Prior to opening statements, Universal Steel dismissed its fraud claim against Daniel and Denise and Daniel and Denise dismissed their misrepresentation counterclaim. At trial, Universal Steel presented the testimony of Victor Gutierrez, III ("Gutierrez"), the vice president of Universal Steel, who testified regarding the contracts executed by Universal Steel and Daniel. Generally, Gutierrez testified that Universal Steel provides only materials for buildings from the "baseplate up" and "anything that is below the baseplate will have to be that elevation, so that everything can form from the baseplate up." (July 26-29, 2022 Tr., Vol. I, at 129). Importantly, Gutierrez explained that Universal Steel "make[s] exactly what it says on [the] drawings from the baseplate up," expecting a customer to "put it on the right pier to get the height to achieve * * * the heights they need." (*Id.* at 146). Here, Gutierrez explained that the Dues family provided Universal Steel with the pier heights that they desired.

**{¶33}** Following delivery of the barn, Gutierrez met with Daniel at the 4212 property to inspect the reported issues. According to Gutierrez, the column height specified in the drawings did not match the column height that was constructed. Likewise, Gutierrez testified that the pier height was constructed "lower than it was intended, so then the building would be lower, because the concrete pier was not the height it was supposed to be." (*Id.* at 138). Specifically, Gutierrez testified that the pier height was constructed at "about 44 inches" when it was supposed to be constructed with a height of "5 foot 11 and a quarter" inches. (*Id.* at 138, 142). Gutierrez testified that the result from the height discrepancy would result in shorter door openings.

**{¶34}** Moreover, Gutierrez testified that the parties' contract reflects that, because a "[b]uyer is solely responsible for designing and constructing a foundation for the building," Universal Steel "has no responsibility or liability whatsoever to [the] buyer for the erection or construction of [the] building, structure, components or goods purchased" under the contract and that "any loss or damage" is "sustained by [the] buyer." (*Id.* at 139-140). Likewise, he testified that the parties' contract reflects that

> [n]o warranty or representation is given by the seller as to exact dimensions, as the same will vary upon concrete base and other factors. In particular, all vertical measurements are taken from the elevation at the base of the steel columns of the building shown in the drawings, and do not take into account different elevations for the building that may result due to finished concrete floor or other elevations.

-18-

(*Id.* at 148). Nevertheless, Gutierrez agreed that one of the bills of lading reflected "some indications written on [it] that there were some missing parts." (*Id.* at 159). However, Gutierrez testified that "[t]o [his] knowledge, [those parts] were not" missing. (*Id.*).

{¶35} Gutierrez testified that he attempted to communicate with Daniel and Kyle regarding the issues with the barn and receiving payment; however, because such resolution was unsuccessful, Universal Steel filed a mechanic's lien on the *4300* property. Gutierrez testified that the purpose for filing the mechanic's lien was to receive payment, not to interfere with any of the Dues family's business relationships. According to Gutierrez, Universal Steel was unaware that the barn was not constructed at the *4300* property. Importantly, Gutierrez testified that Universal Steel assumed that the barn was constructed on the *4300* property because "the agreement state[s] that the buyer's * * * location was to be [the] 4300" property. (*Id.* at 156).

{¶36} On cross-examination, Gutierrez testified that Universal Steel learned that the mechanic's lien was filed on the wrong property "[r]eal soon after" it filed its complaint in this case. (*Id.* at 177). He testified that he was aware that Daniel requested Universal Steel (on multiple occasions) to remove the mechanic's lien from the 4300 property. Gutierrez further testified that, even though the

"mechanic's lien [was declared] invalid" on April 29, 2020 by the trial court, Universal Steel did not release the defective lien until July 29, 2020. (*Id.* at 185).

{¶37} Gutierrez testified that the parties' contract provides that the "[s]ole exclusive remedy [is] replacement, repair or credit." (*Id.* at 190). However, Gutierrez testified that Universal Steel did not adhere to that contract term. Specifically, Universal Steel did not offer to replace or repair the barn or offer Daniel a credit for the missing parts; rather, Universal Steel "offered [only] to come and inventory the building for Mr. Dues to seek payment, and he declined." (*Id.* at 191). Gutierrez testified that, when he travelled to the Dues family's farm, he observed that they altered or "field adjust[ed]" the barn to try to achieve the contracted-for door heights. Nonetheless, Gutierrez testified that "the shipper list" reflects a total product weight of 209,000 pounds but that the bill-of-lading summary reflects only 203,000 pounds. (*Id.* at 187). Further, Gutierrez testified that he could not explain the discrepancy and that he did not "know any parts that [were] missing." (*Id.* at 188).

{¶38} On the trial court's examination, Gutierrez testified that Universal Steel did not provide the 6000 pounds of missing material to the Dues family.

{¶39} However, on re-direct examination, Gutierrez testified that Universal Steel did not ascertain which parts were missing to cause the discrepancy between the shipper list and the bill of lading since the barn was fully constructed. According to Gutierrez, the Dues family would not have needed to alter the barn "[t]o get a

higher door" if "the foundation [had not been] poured short * * * ." (*Id.* at 199). Finally, he testified that Universal Steel was not required to follow the "buyer's remedies" provided in the contract because it was not in breach of the contract. (*Id.* at 201).

{¶40} As its second witness, Universal Steel offered the testimony of Rethman, who testified that she designed the plans for the foundation of the barn "[f]rom the baseplates to the ground." (July 26-29, 2022 Tr., Vol. II, at 305-306). Specifically, Rethman testified that Universal Steel provided the "elevations" and she "state[d] those elevations on [her] drawings * * * [t]o correspond with the plans for the pre-engineered metal building." (*Id.* at 306). Rethman testified that "the piers are what the structural steel sits on * * * ." (*Id.* at 318). According to Rethman, when drafting plans for a structure, "[t]he wall[ heights] have nothing to do with the pre-engineered metal * * * construction" because the walls do "not control the height of the structure"; instead, "[t]he concrete piers control the height of the structure." (*Id.* at 318-319). Importantly, Rethman testified that the elevation of the piers (which were incorporated in her plans) match the pier elevation provided by Universal Steel.

{¶41} On cross-examination, Rethman testified that "this farm was not a new pad that was being developed, which was going to be level." (*Id.* at 336). Rather, she testified that "[t]he whole grade [of the existing concrete pad] is * * * sloped." (*Id.* at 338). Rethman testified that her design did not involve the sloping pad

because it did not "matter" since "they built the piers first, and then the walls, and then the slab." (*Id.* at 339).

**{¶42}** Rethman further testified that, after the project was finished, she conducted "a walkthrough to make sure" "that all the anchor bolts were on the columns, that the bracing was in the bays that we're [sic] calling for them, that the roof had the bracing that they called for," and to make sure those items were "installed correctly." (*Id.* at 340). In other words, her inspection was "to make sure that it was structurally designed, per the drawing, so that [she could] sign off on the building." (*Id.* at 341). Critically, she testified that ensuring the heights of the doors was not part of her inspection. Specifically, she testified that "[i]t doesn't matter * * * what the door opening is or how tall that building is, because in the submittal is the design loads, and that is all that matters * * * , to make sure that the building is designed per the design loads." (*Id.*). Likewise, Rethman did not inspect the heights of the foundational walls.

**{¶43}** Moreover, according to Rethman, "[t]he NRCS does a final review, and they come through" and she assumed "that when [she] signed off on it, that the NRCS was happy with the design, and therefore, proceeded with paying [the Dues] with money." (*Id.* at 342). However, she testified that the NRCS "will not pay [the Dues] the money until they get [her] final drawings, and they do a final walkthrough." (*Id.*).

{¶44} On re-direct examination, Rethman clarified that an as-built drawing reflects any changes to a structure that were made after the drawings were submitted. Nevertheless, Rethman testified that there were no changes made after her drawings were submitted. Rethman clarified that "the elevations [specified in the drawings are] relative to a benchmark" since the existing concrete pad is sloped. (*Id.* at 346). Specifically, she testified that "somebody found a spot on the site and called it a benchmark" "[a]nd they set their transit unit on it, which is a surveying unit" "[a]nd then they shoot elevations off of those." (*Id.*). She further specified that at the benchmark spot, "one pier could be 5 foot 11 and [a] half"; however, since "the grade could either go up or down," "it could actually be 6 foot, 7 foot taller. It could be 4 foot, 3 foot taller * * * ." (*Id.* at 346-347). She testified that she did not know who set the benchmark.

{¶45} As part of their case, the Dues family presented the testimony of Kyle, who testified that his family explained "the features and aspects that [they] wanted in th[e] barn" to Universal Steel. (*Id.* at 369). Specifically, those features included "a sloping floor, so that the liquid manure [could] be flushed down to the lagoon to make [their] lives more efficient, so [they] didn't have to run a skid loader in there every day to scrape out the aisles" along with the "manure management" system provided for under EQIP. (*Id.*). According to Kyle, the most important features of the barn are the "north doors, especially the northeast" because they needed those

openings to be a certain height "to be able to get things in * * * to manage manure." (*Id.* at 382).

{¶46} Kyle testified that concrete floor on which the barn is constructed "[s]lopes uphill, and it actually raises two and a half feet from center to the end of the building on both sides." (*Id.* at 403). Kyle informed the jury that the Dues family wanted the floor to be sloped "[s]o that water can flush down, and it cleans all the manure out of the facility, so that's two hours a day that [they did not] have to have someone wearing a skid loader out"; rather, "[i]t's all gravity fed down, gets rid of the manure, keeps cows cleaner." (*Id.* at 376-377). Critically, Kyle testified that Universal Steel expressed that it understood that the floor would be sloped.

{¶47} Notwithstanding the Dues family's vision for the barn, the Dues family has not been able to use the flush system because they were not able to purchase "the plumbing equipment for the flush system" since their "resources [were] tied up in litigation, and the banks [would not] give [them] anything else * * * ." (*Id.* at 377-378). According to Kyle, the barn features "a steel plate to fold down to feed through, [that they] can drive over, and manure goes under" but they "haven't been able to utilized it, because" the flush system is unusable. (*Id.* at 401). Kyle testified that they are also unable to use the dry-manure management system because they "were supposed to be able to drive a semi in to load it, and [they] cannot do that" since "the building was not built correctly." (*Id.* at 378). He

identified Defendant's Exhibit MM as a video that he recorded demonstrating that a trailer will not fit through the opening in the northeast corner of the barn.

{¶48} Importantly, Kyle summarized that Universal Steel "failed to make [the barn] tall enough." (*Id.* at 378). Kyle testified that they "were able to raise the whole awning" on the south side of the structure to achieve a 14-foot opening but that they were unable to replicate their efforts at the northeast corner of the barn. (*Id.* at 398). He explained that the height of the door in the northeast corner of the barn is only "11 foot 9, with no header or anything in it." (*Id.* at 391). In particular, he testified that his family was unable to achieve the necessary door "height in that northeast corner" because "[t]he roof was too low" and "there was no way to correct that" "without completely tearing that whole part of the building down, and cobbling it up * * * ." (*Id.* at 383-384). In sum, Kyle testified that the barn "definitely [does not look] how it's supposed to look." (*Id.* at 383).

{¶49} Kyle testified that, even though they received all of the pieces (except for some trim) necessary to construct the barn, the shipment was missing 6,000 pounds from the delivery on the bill of lading because the column pieces that were tendered by Universal Steel were not long enough. He testified that if the "walls weren't right, * * * the roof would all be lopsided, if you put all those pieces where they go." (*Id.* at 378). Indeed, according to Kyle, "any claims that * * * the foundation is incorrect is * * * simply not true, because the building fit to the foundation." (*Id.* at 395). He testified that "in [Universal Steel's] design, whether

their engineer knew it or not, he achieved the height at that doorway at the lowest point. It just failed to account for the slope." (*Id.* at 396).

{¶50} Kyle testified that A&J Framing mistakenly measured the concrete-column height "in tenths" instead of "in feet inches * * * ." (*Id.* at 390). Therefore, the columns "on the outside, on the south, southwest" side of the building are two and three quarters inches shorter than originally intended. (*Id.*). According to Kyle, "instead of blaming them, ripping concrete out, trying to cobble something together, [the Dues family] footed the bill for a change order to add the columns, extended that two and three quarter inches to make everything right." (*Id.*).

{¶51} Kyle testified that the parties' contract provides "Replacement, Repair or Credit" as the "Sole Exclusive Remedy" but that Universal Steel did not offer to replace or repair the barn or offer a credit on the barn. (*Id.* at 380).

{¶52} On cross-examination, Kyle testified that "[y]ou can measure the walls all you want. They're at the correct elevation. Obviously, the building is sitting there." (*Id.* at 412-413). Kyle testified that Universal Steel's drawing for the barn reflects a pier with "the dimension for the 14 foot [pier which] goes from the header to the very bottom of the foundation." (*Id.* at 416). According to Kyle, Universal Steel's drawing for the barn was drafted in error by reflecting the measurement of the pier from the bottom of the foundation instead of the cement floor.

{¶53} Kyle further testified on cross-examination that the barn was delivered in "800,000 pieces," which made their inventory of those pieces "not possible."

(July 26-29, 2022 Tr. Vol. I, at 210). Kyle described that they "scattered everything out as much as possible" "over two acres, trying to figure out * * * what was all there," but they "couldn't pinpoint the exact piece, so they started [constructing the barn]" to determine where the deficiency was. (*Id.* at 211). Kyle testified that "there wasn't a certain piece missing, after going through the erection process"; rather, they determined that "all the main columns are too short, so that's where [the missing] 6,000 pounds come from." (*Id.* at 212). He clarified that the "mainframe columns that hold [the] entire roof up, if they were three feet longer, and you do the calculations on the entire building, that's [the missing] 6,000 pounds." (*Id.* at 213).

{¶54} Kyle testified that only "[t]he solid manure section" of the barn is part of EQIP. (*Id.* at 222). He testified that "the whole purpose of building this barn was [for manure management and] get the manure out of the Grand Lake watershed, [but they] have not been able to do that." (*Id.* at 225). Because they are unable to remove manure from the barn, they are using the barn for storage. Kyle testified that they have been unable to finish the barn, not only because the openings are not 14-feet tall, but because their "resources all have been tied up with litigation." (*Id.* at 229). He testified that the barn is only "30 percent in use" because of the deficiencies. (*Id.* at 231).

{¶55} On re-direct examination, Kyle identified Defense Exhibit BB as email communications (conducted in April 2014) between him and a representative of Universal Steel discussing what the Dues family expected from the barn.

Specifically, Kyle testified that he informed the representative of Universal Steel that they were "looking to utilize a flush system to clean up manure, [with] a sloped floor, and the cows have to eat over [a] wall." (July 26-29, 2022 Tr. Vol. II, at 421). Kyle testified that he also attached a sketch of the barn to the email. Specifically, he testified that the sketch "depicts the[] columns * * * sitting on th[e] sloped wall, because [they] needed to keep that wall consistent with the floors" and that they "wanted 16 inches of wall above the floor the entire length of the building both ways." (*Id.* at 422).

{¶56} Next, Craig testified on behalf of the Dues family that the ventilation of the barn is a significant feature that they sought when designing the barn. However, Craig testified that the barn, as built, did not provide the necessary updraft for ventilation because "the steel legs [are] short." (July 26-29, 2022 Tr., Vol. III, at 442). Specifically, Craig testified that "the building that [they] had in mind had a 16 foot eave edge." (*Id.* at 446). However, "with th[e] 4 foot overhang that [they] put around the entire perimeter of the building, [that] lowered that eave edge by 16 inches," and Universal Steel "failed to compensate for that additional 16 inches." (*Id.*). Because Universal Steel failed to compensate for the additional 16 inches, the Dues family did not achieve the updraft for ventilation that they sought.

{¶57} Daniel testified that they did not achieve either of the 20 by 14 foot openings as called for in the parties' contract. However, Daniel testified that they were able to execute a field adjustment and achieve one of the 20 by 14 foot

openings on the south end of the barn but that they could not replicate the adjustment for the opening at the northeast corner of the barn. According to Daniel, they were unable to field adjust the opening at the northeast corner of the barn because the roof is "too short." (*Id.* at 472). Instead, they were able to achieve a height of only 12 feet. Daniel testified that neither of the openings on which they conducted field adjustments appear as they were intended to appear. Specifically, the "south side does not match the north side" because there was "a canopy on the north side and the south side, but [they] had to take the south whole canopy across the whole end of the barn, lift it up 4 feet, and [they] had to jerry-rig the ends to match the other roof sloping down * * * ." (*Id.* at 473). Daniel described that the opening at the northeast corner of the barn is the "main [entrance] to the manure storage, and that's what truly is the end of the feed aisle, where [they] run feed wagons in there every day." (*Id.* at 472).

{¶58} Daniel testified that he requested an estimate to repair the building to correct the height of the northeast opening as well an estimate to tear down and replace the building. He testified that, notwithstanding the term in the contract providing that the "sole and exclusive remedy" is "[r]eplacement, repair or credit," Universal Steel did not offer to replace or repair the barn or offer them credit for the defects in the barn. (*Id.* at 474-475).

{¶59} Daniel testified that he contacted Universal Steel "when the last load of steel" arrived since the "bill of lading weight didn't match what * * * Universal

Steel said the building was going to weigh, on [the] pre-build packet." (*Id.* at 475). As a result of that conversation, Daniel "called the bank [the next morning], [and] told them to cancel the[] three checks" "because it was 6000 pounds short," "[t]here was something missing," and he "wanted an answer." (*Id.* at 481).

**{¶60}** Daniel testified that the mechanic's lien affected his relationship with Farm Credit. According to Daniel, the Farm Credit branch in Celina "will not talk to [him]," and that he has to travel to Washington Courthouse, Ohio for service. (*Id.* at 495). Further, Daniel testified that Farm Credit accelerated a $155,000 note and he "had to pay it back in 30 days," he can no longer write checks from his account, and "[t]hey took the rest of [his] other revolving line of credit [and increased] the interest rate up [over] 8 * * * percent." (*Id.* at 499). Moreover, Farm Credit assessed its attorney fees associated litigating the mechanic's lien to his account. Daniel further testified that the mechanic's lien prevented them from finishing the flush system as well as "other things around the farm." (*Id.* at 496).

**{¶61}** On cross-examination, Daniel testified that even though the contract specified for two 20 by 14 foot openings, the contract further provided that

> building size and other dimensions are approximate and intended to identify standard sizes sold by the seller. Except when specifically indicated, all dimensions are exterior dimensions. No warranty or representation is given by the seller * * * as to exact dimension, as the same will vary upon concrete base and other factors. In particular, all vertical measurements are taken from the elevation at the base of the steel columns of the building shown in the drawings and do not take into account differing elevations from the building that may result due to finished concrete floor or other floor elevations.

(July 26-29, 2022 Tr., Vol. III, at 510). He testified that A&J Framing poured "13 columns, on the southwest corner" "2 and 3 quarter inches" short. (*Id.* at 551). However, Daniel testified that he did not instruct A&J Framing to lower the walls "because that was all set in stone." (*Id.* at 552). According to Daniel, A&J Framing constructed "a 2-foot wall in front of [the] cows just like industry standard is." (*Id.* at 557).

{¶62} Keith Schnippel ("Schnippel"), a construction general contractor, testified on behalf of the Dues family that he "was engaged to go and review the building and create a report on * * * what the issues were within the building." (*Id.* at 562). Schnippel testified that he reviewed all of the plans provided by Universal Steel as well as Rethman's plans. He testified that he visited the barn and noticed that "the opening [at the northeast corner of the barn] had been modified from the original design documents. There was supposed to be an overhang from the exterior wall, a cantilever eave. That had been removed to allow more height, because when they bolted the system up * * * it was not 14 foot from the floor slab." (*Id.* at 571-572).

{¶63} Schnippel identified Defendant's Exhibit 11 as a report that he prepared after reviewing "all of the Universal [Steel] plans, the Rethman Design plans, the contract document between [the] Dues and Universal [Steel], and visit[ing] the site." (*Id.* at 577-578). He testified that he observed that the opening

at the northeast corner "was approximately 12 feet" (after the Dues family erected the barn) "[j]udging from the floor to approximately where the original bolt holes were." (*Id.* at 581). According to Schnippel, Universal Steel's drawings reflected that the opening "was to be a 14-foot wall opening." (*Id.* at 583). However, Schnippel resolved that Universal Steel "did not consider the sloping floor slab" when it drafted its plans for the barn and its failure to consider the floor slope is what caused the deficient door heights. (*Id.* at 583). Specifically, Schnippel testified that Universal Steel "constantly reference[s] to the bottom of [the] diagonal lines, which is a flat plain straight across. But when the floor slopes up, you're losing height. * * * The floor slab is sloping up towards the north and to the south [causing a loss of] two feet or three feet of elevation in those openings, and that's why [they did] not get[] the 14-foot tall opening there." (*Id.* at 584). According to Schnippel, Universal Steel based its dimensions from "the lowest part of the floor slab inside of the building." (*Id.* at 586).

{¶64} On cross-examination, Schnippel testified "that depicting a 14 foot tall opening, you're not going to [get the] result with that in the actual field, because you have a 4 foot concrete wall going through it." (*Id.* at 602).

{¶65} On re-direct examination, Schnippel identified Defense Exhibit Z as a letter that he prepared to the Dues family explaining "any solutions on modifying the openings to allow vehicular traffic to enter in and out * * *." (July 26-29, 2022 Tr., Vol. IV, at 621). He testified that he "propose[d] to modify the existing

structure for the installation of the originally proposed 20 foot * * * wide by 15 foot high overhead door in the northeast corner of the building." (*Id.* at 622). To achieve the modification, they would be required to take "a portion between the first two rows of columns, and remov[e] a portion of the roof, and chang[e] the slope to allow that eave height to be higher. So instead of being a single slope, the roof would come down, and there would be then a change in pitch, and it would be flatter to raise that opening height." (*Id.* at 622). As to the south end of the barn, Schnippel testified that he proposed "to remove the overhang above the overhead door," which, according to Schnippel, would "substantially change the aesthesis of the building." (*Id.* at 623). In sum, the proposed price for the alterations was $155,400 in 2019 (and that estimate was revised to $163,300 in 2022).

{¶66} Schnippel further testified that he provided an estimate "to completely replace the building and raise it to make sure that it matched the original proposal that was proposed to the Dues' farm" "from the metal plates up." (*Id.* at 630). According to Schnippel, the proposed price was $925,000.

{¶67} On re-cross examination, Schnippel testified that the proposed replacement barn includes 20-foot eaves where the original barn includes 16-foot eaves.

{¶68} Next, Brad J. Core ("Core"), a licensed-professional and agricultural engineer, testified on behalf of the Dues family that he "was asked to analyze * * * the building and determine * * * what the source of the problem was with the

building that was causing issues with the doors that were to be constructed on it." (*Id.* at 660). Core testified that "the problem with the doors is that the building, the steel metal building that sits on top of the foundation was, through an error, was built too short, and therefore, * * * there is not enough clearance * * * to allow for the doors that were contracted for to be built the * * * size they were contracted for, the height." (*Id.* at 660-661). He further testified that "the error was made by * * * Universal [Steel]" "[a]nd it was a dimensional error on the plans that led to that ultimate error in the manufacture of the building * * * to be too short." (*Id.* at 661).

{¶69} Specifically, Core testified that Universal Steel made "[a] dimensional error on the plans, that instead of dimensioning the door opening, it dimensioned it at the right size, but instead of dimensioning it at the top of the concrete foundation wall, it dimensioned it to the bottom of the concrete foundation wall, or the top of the footing, which makes * * * that opening size unattainable * * * ." (*Id.* at 673). Further, he testified that "[t]he result is a 2 foot, 3 foot, or 4 foot reduction in height or clearance for the framed door openings in the side walls" and "a 2-foot reduction in height or clearance for the framed door openings in the south end wall." (*Id.* at 673-674). In sum, he testified that Universal Steel's plans "call[] for those doorways to be erroneously measured from the bottom of the foundation wall, rather than the top of the foundation wall," which resulted in the building being "too short," causing "modifications to the building to increase the height/clearance of the frame doorway." (*Id.* at 674-675).

{¶70} Importantly, Core testified that he compared Universal Steel's plans with Rethman's as-built plans and "concluded that they * * * are in * * * harmony with one other [sic], with the exception of the south wall and the southern portion of the west wall of the * * * building," which "differ by two and three-quarter inches * * * ." (*Id.* at 679-680).

{¶71} Core testified that he reviewed Isaac Lewin's ("Lewin") report that was prepared on behalf of Universal Steel and disagreed with his conclusions. Specifically, Core testified that Lewin based his measurements "on the top of the floor slab at the northeast corner of the cow barn," which is *not* the lowest portion of the concrete in the barn. (*Id.* at 684). He further disputed Lewin's conclusion that "[t]he elevation differences established the concrete walls were not constructed in accordance with either the [Universal Steel] or Rethman drawings" because Lewin based his measurements off of the northeast corner of the barn instead of the middle (in which the lowest point of the barn is located). (*Id.* at 686). Significantly, Core testified that he "went to great lengths in [his] report to make sure that the elevations that are in [his] report are the exact same system of both plans that agree." (*Id.* at 687). As a result, Lewin's measurements are off "exactly 2.19 feet." (*Id.*).

{¶72} On cross-examination, Core clarified that he "picked a point in total agreement between the two sets of plans and used it as the basis for [his] elevation system * * * ." (*Id.* at 727). Core testified that he did not review any of the change orders when he reviewed the plans for the barn.

**{¶73}** On re-direct examination, Core confirmed that "the dimensional error on the Universal [Steel] plans caused the metal building that is erected on top of the concrete foundation to be built too short, and therefore, * * * the building [does] not properly accommodate the doors that were contracted for." (*Id.* at 763).

**{¶74}** Next, Christian Donovan ("Donovan"), counsel for Farm Credit, testified that Farm Credit was named as a party to the case because "there was a foreclosure action brought by Universal [Steel], after they had filed a mechanic's lien." (*Id.* at 767). Donovan specified that Farm Credit has "a mortgage against the real estate [at issue in this case], and so to secure a loan from the Dues." (*Id.* at 768). Donovan testified that Farm Credit requested Universal Steel to stipulate to its "lien priority that Farm credit was first in front of the mechanic's lien." (*Id.* at 776). According to Donovan, even though such stipulation was recommended by the trial court, Universal Steel refused (without explanation) to stipulate to the lien priority. Donovan testified that he "thought [Universal Steel was] acting unreasonable" since he "didn't see any reason that they shouldn't stipulate. That's common practice." (*Id.* at 777). Because Universal Steel refused to stipulate to the lien priority, Farm Credit's [attorney] fees [were] assessed to the Dues' account"—namely, $9,751.39. (*Id.* at 779).

**{¶75}** Moreover, Donovan testified that

the mechanic's lien was filed against property that was never improved, so [Universal Steel] filed it against the wrong property, which they knew about very quickly because [Farm Credit] brought it

to everyone's attention. Which at that point, [he] assume[d] [Universal Steel] would have released it as * * * the whole point of a mechanic's lien is * * * to improve the real estate. That's why [a party is] given that * * * lien right.

(*Id.* at 779-780). Donovan testified that "a mechanic's lien that's recorded on unimproved property for [sic] the wrong property, is * * * defective immediately." (*Id.* at 780).

{¶76} On cross-examination, Donovan recalled "that there was something in the contract regarding th[e] location" where the Dues reside as "being an explanation provided as to why [the mechanic's lien] was filed against that property * * * ." (*Id.* at 806). However, Donovan testified that he "learned through the litigation that [the Dues family] installed or built [the barn] on one property and the mechanic's lien was on a different one." (*Id.* at 807). Donovan further testified that Farm Credit "had an issue with making disbursements [to the Dues family], because [Farm Credit] could lose priority of their lien, if they disbursed after they are notified of a mechanic's lien, so there was an issue * * * with accessing that line of credit." (*Id.* at 808). Donovan clarified that "Farm Credit said [the Dues family] could not access" the line of credit "because [Farm Credit] can't make disbursements, as long as this mechanic's lien is here." (*Id.* at 810).

{¶77} As part of its case, Universal Steel presented the testimony of Beverly Kremer ("Kremer"), a financial officer with Farm Credit, who testified that she is the loan officer on the Dues family's loan for the construction of the barn.

Importantly, Kremer testified that she was aware that the Dues family farm "was split up into two parcels." (July 26-29, 2022 Tr., Vol. V, at 870). She testified that Daniel and Denise had a mortgage (on the 4300 property) with Farm Credit for a $155,000 line of credit for the dairy-barn project. Kremer further testified that the Dues family had a mortgage (on the 4212 property) for $475,000 for the construction of the barn.

{¶78} Kremer identified Plaintiff's Exhibit 18 as a January 12, 2018 letter of concern that Farm Credit sent to Daniel, Denise, and Kyle following an annual financial review performed on the Dues family's accounts. In sum, she testified that the concerns identified in the letter could have an impact on the Dues family's financing with Farm Credit.

{¶79} Kremer testified that it was determined that the Dues family "had a negative working capital by a review of the Dues' balance sheet" as well as "cost overruns for the dairy barn project [were] reaching a total of approximately $250,000." (*Id.* at 855-856). Specifically, Kremer testified that the letter identifies that "a $155,000 line of credit" "was established to cover [NRDC's] grant portion of the dairy barn project." (*Id.* at 857). She testified that she was unsure whether the reason that it had not been repaid was because the grant had not yet been released to the Dues family. As a second concern, she testified that "other significant cost overruns have been experienced during the dairy barn construction project, and the facility is still incomplete, per building plans provided." (*Id.* at 859-860). Finally,

she testified that Farm Credit identified the "litigation status [of this case] and its short and long-term implications on [the Dues family's] financial well-being." (*Id.* at 860).

**{¶80}** Furthermore, Kremer testified that Farm Credit identified as operational and financial concerns the "[s]tagnant growth of [the Dues family's] dairy herd from approximately 100 to 150 milking cows to maximize the capacity of the new facility." (*Id.* at 862). The letter also identifies that there was a "stagnate increase in production of milk per cow," that the herd "average currently [was] between 56 to 58 pounds per cow per day," and that "[p]rojections of 70 pounds were used in making [the] credit decision for repayment of the debt extended for the new building." (*Id.* at 867).

**{¶81}** Kremer testified that she met with the Dues family at the farm following the transmission of the letter of concern and informed Daniel that "due to the mechanic's lien being filed and the litigation," Farm Credit "would need to stop draws on th[e] loan until things were * * * resolved." (*Id.* at 866-867).

**{¶82}** On cross-examination, Kremer testified that Farm Credit learned of Universal Steel's mechanic's lien after Universal Steel filed its complaint for foreclosure of the lien in this case. Kremer testified that Farm Credit's legal counsel informed her that Universal Steel filed the mechanic's lien on the wrong property. She testified that, "when Farm Credit institutionally learned of the mechanic's lien on the Dues' property, [it] change[d] the nature of the relationship with the

customer" since "Farm Credit becomes concerned about its security, its collateral, that is the real estate * * * ." (*Id.* at 884). Specifically, Kremer testified that Farm Credit's legal counsel instructed the bank to "not disburse any more, due to the lien on the property" and the Dues family's account was transferred to "special accounts" in Washington Courthouse, Ohio. (*Id.* at 885, 887).

{¶83} As its next witness, Mark W. Bernlohr ("Bernlohr"), a construction and commercial attorney, testified on behalf of Universal Steel that there "are legitimate, valid, legal reasons, for refusing to stipulate to the priority of a mortgage." (*Id.* at 903). Specifically, he testified that "as a lawyer what you do is say, no, you're going to have to prove that your mortgage is perfect" that "there is no fraud, that * * * the signatures are valid, that the notary was performed properly" because "as a lien claimant, you'd like to knock that mortgage out." (*Id.* at 903-904). Bernlohr testified that, if a mechanic's lien is not timely filed, a party "can still file suit" since "[a] mechanic's lien is only a device to try to secure payment * * * ." (*Id.* at 905).

{¶84} On cross-examination, Bernlohr agreed that the mechanic's lien that was filed in this case was defective because it was filed on the wrong property since "if you file a lien on one property, * * * it has to absolutely be on the property where the project is." (*Id.* at 907).

{¶85} Next, Universal Steel presented the testimony of Tyler Theuret ("Theuret"), a structural engineer, who testified that he was asked to "consider a

modification to th[e] steel structure" at issue in this case. (*Id.* at 918). Specifically, Universal Steel requested that he recommend such modification to only the opening at the northeast corner of the barn. Theuret identified Plaintiff's Exhibit 30 as the design that he prepared for the modification of the barn. Theuret testified that he proposed removing "part of the roof in the corner of the building * * * to put a lower slope, so * * * it would be higher than it was * * * ." (*Id.* at 920).

{¶86} On cross-examination, Theuret testified that he reviewed only one set of Universal Steel's plans for the building and that he did not review Rethman's design plans.

{¶87} Universal Steel then recalled Gutierrez, who testified that he reviewed the modification proposed by Theuret. Gutierrez testified that he determined that the cost of the modification proposed by Theuret "is $24,000" for the materials. (*Id.* at 934). He further testified that he obtained a "labor and cost" "quote from a contractor for the modification of this steel structure" for $23,200. Consequently, "the total amount required for the modification proposed by" Theuret is $47,200. (*Id.* at 936).

{¶88} As its final witness, Universal Steel presented the testimony of Lewin, a structural engineer, who testified that he prepared a report regarding his observations about the barn at issue in this case. Specifically, he testified that he reviewed the plans provided by Universal Steel as well as Rethman's design plans. According to Lewin, Rethman's design plans "conformed exactly per the Universal

[Steel] design plans." (*Id.* at 953). Lewin testified that, based on his review of the barn, he "found that consistently around the perimeter of the building, and some of the interior piers, the foundations were anywhere from 18 inches to 2 to 2 and a half feet lower than what the drawings called for by both the Universal Steel drawings and the Rethman drawings." (*Id.* at 953-954). Lewin concluded that "the contractor * * * misinstalled the foundations that were [the] wrong height." (*Id.* at 954). He testified that "everything in the barn was consistently lower than what it was called for on the design drawings." (*Id.* at 968).

{¶89} According to Lewin, the "plans call for a corner pier to be 5 foot 11 and a quarter from the finished floor" at "the north end of the structure." (*Id.* at 970-971). However, he testified that "the foundation for the building was built approximately two feet lower than it originally was called for in both the Rethman plans and the [Universal Steel] building plans." (*Id.* at 976). Lewin testified, "[b]ased on review of both the [Universal Steel] design plans and the Rethman design plans, that a 14 foot [sic] goes from the bottom of the door head to the finished floor of the building." (*Id.* at 979).

{¶90} On cross-examination, Lewin testified that he was not only "unable to verify the slope of the concrete floor" when he inspected the barn but that he "did not check" the slope of the floor when he inspected the barn. (*Id.* at 983-984). Critically, Lewin testified that his measurements were based "on the top of the floor

slab at the northeast corner of the cow barn" and that he did not take any measurements from the center of the barn. (*Id.* at 986).

**{¶91}** Lewin testified that he disagreed with Schnippel's analysis in his report because he could not "find any evidence of sloping floor on Rethman['s] drawing, as they were responsible for the foundation and concrete slab design." (*Id.* at 988). However, Lewin identified an email exchange between Kyle and Universal Steel depicting the sloped-floor design and an email exchange between Universal Steel and Edgardo Schmitz, the person who drafted the design plans for Universal Steel, requesting information regarding "what the slope of that floor is." (*Id.* at 989). In sum, Lewin testified that he was not "asked by Universal [Steel] to do anything in terms of figuring the slope of the floor, what the slope grade was, where it sloped to * * * ." (*Id.* at 990). He clarified that he "measured the perimeter of the building, which made the slope of the floor irrelevant to [his] analysis." (*Id.* at 992). Significantly, Lewin testified that he was distracted the day he visited the Dues' farm to conduct his inspection because he "fell into the manure pit on the property." (*Id.* at 1000-1001).

**{¶92}** At the close of Universal Steel's case in chief, the Dues family moved for a directed verdict as to Universal Steel's breach-of-contract claim against Daniel and unjust-enrichment claims against the Dues sons, which the trial court denied. Likewise, at the close of the Dues family's case in chief (and at the close of all evidence), Universal Steel moved for a directed verdict as to Daniel and Denise's

counterclaims for tortious interference with a contract and a business relationship, which the trial court denied.

**{¶93}** On July 29, 2022, the jury awarded a verdict in favor of Universal Steel as to its breach-of-contract claim against Daniel and awarded Universal Steel $166,875.00 in damages. However, the jury awarded a verdict in favor of Daniel and Denise as to their breach-of-contract counterclaim and awarded them $256,500.00 in damages. Further, the jury awarded a verdict in favor of the Dues sons as to Universal Steel's unjust-enrichment claims and a verdict in favor of Universal Steel as to Daniel and Denise's counterclaim for tortious interference with a business relationship. Nevertheless, the jury awarded a verdict in favor of Daniel and Denise as to their counterclaim for tortious interference with a contractual relationship and awarded them $9,751.31 in compensatory damages.

*Universal Steel's Motion for Directed Verdict*

**{¶94}** On August 2, 2022, Universal Steel filed a motion for a directed verdict as to Daniel and Denise's counterclaim for punitive damages. On August 5, 2022, Daniel and Denise filed a memorandum in opposition to Universal Steel's motion for a directed verdict. Nevertheless, the jury trial reconvened on August 5, 2022 as to Daniel and Denise's counterclaim for punitive damages because of the jury's compensatory-damages award in favor of Daniel and Denise. That day, Daniel and Denise presented the testimony of Gutierrez as to their counterclaim for punitive damages. Gutierrez testified that he learned in September 2017 that the

mechanic's lien was filed on the wrong property. According to Gutierrez, Universal Steel "followed legal counsel, their advice" to retain the defective mechanic's lien on the 4300 property. He testified that the mechanic's lien was not released by Universal Steel until July 29, 2020—three months after the trial court's decision declaring it defective. Ultimately, the trial court granted Universal Steel's motion for a directed verdict after concluding that "reasonable minds could only conclude that Universal did not act with actual malice * * * ." (Doc. No. 402).

**{¶95}** On August 11, 2022, the trial court filed a judgment entry on the jury's verdict granting judgment in favor of Universal Steel against Daniel in the amount of $166,875.00, judgment in favor of Daniel and Denise against Universal Steel in the amount of $256,500, and judgment in favor of Daniel and Denise against Universal Steel in the amount of $9,751.39.

**{¶96}** On September 7, 2022, Universal Steel filed a motion for prejudgment interest (in the amount of $38,372.11) on its judgment in the amount of $166,875.00 as well as a motion for attorney fees. The Dues family filed memoranda in opposition to Universal Steel's motions for prejudgment interest and attorney fees. On October 21, 2022, the trial court granted Universal Steel's motion for prejudgment interest (in the amount of $38,372.11) but denied Universal Steel's motion for attorney fees. (Doc. Nos. 424, 432).

*Universal Steel's Motions for JNOV and Remittitur*

{¶97} Also on September 7, 2022, Universal Steel filed motions for JNOV as to Daniel and Denise's counterclaim for tortious interference with a contract and remittitur as to the jury's damage award as to Daniel and Denise's breach-of-contract counterclaim. (Doc. Nos. 407, 408). On September 20, 2022, Daniel and Denise filed memoranda in opposition to Universal Steel's motions for JNOV and remittitur. On October 21, 2022, the trial court granted Universal Steel's motion for JNOV as to Daniel and Denise's counterclaim for tortious interference with a contract. (Doc. No. 428). Specifically, the trial court concluded that Universal Steel was justified in alleging its claim for foreclosure of a mechanic's lien and that there was insufficient evidence presented at trial supporting that Universal Steel intended "to procure a contractual breach between the Dues and Farm Credit." (*Id.*). That same day, the trial court denied Universal Steel's motion for remittitur. (Doc. No. 426).

*The Dues Family's Motion for JNOV*

{¶98} On September 9, 2022, the Dues family filed a motion for JNOV as to Universal Steel's breach-of-contract claim. On September 21, 2022, Universal Steel filed a memorandum in opposition to the Dues family's motion for JNOV. The Dues family filed a reply to Universal Steel's memorandum in opposition to their motion for JNOV on September 28, 2022. On October 21, 2022, the trial court denied the Dues family's motion for JNOV after concluding that "[t]he jury was given clear and direct instructions regarding Universal's claim for breach of contract

and rendered a decision in favor of Universal [Steel] based on the evidence." (Doc. No. 430).

{¶99} Finally, the trial court certified that there is no just reason for delay on October 21, 2022. (Doc. No. 435).

{¶100} On November 16, 2022, Daniel and Denise filed a motion for prejudgment interest (in the amount of $53,956.36 on his judgment in the amount of $256,500.00. Universal Steel filed a memorandum in opposition to Daniel and Denise's motion for prejudgment interest that same day. On December 7, 2022, the trial court denied Daniel and Denise's motion for prejudgment interest.

{¶101} Daniel and Denise filed a notice of appeal on November 21, 2022. Universal Steel filed a notice of cross-appeal on November 23, 2022. Daniel and Denise raise three assignments of error, and Universal Steel raises four assignments of error for our review.

{¶102} For ease of our discussion, we will begin by discussing Daniel and Denise's first and third assignments of error together, followed by Daniel and Denise's second assignment of error. Then, we will discuss Universal Steel's first, second, third, and fourth assignments of error.

**Daniel and Denise's First Assignment of Error**

**The Trial Court Erred By Granting Universal's Motion For Judgment Notwithstanding The Verdict On Dues' Claim for Tortious Interference With a Contractual Relationship.**

**Daniel and Denise's Third Assignment of Error**

**The Trial Court Erred By Denying Dues' Motion For Judgment Notwithstanding The Verdict On Universal's Claim For Breach Of Contract.**

{¶103} In their first and third assignments of error, Daniel and Denise argue that the trial court erred by granting Universal Steel's motion for JNOV as to their counterclaim for tortious interference with a contract, and erred by denying their motion for JNOV as to Universal Steel's breach-of-contract claim. In particular, in their first assignment of error, Daniel and Denise argue that evidence was presented at trial from which reasonable minds could conclude only that Universal Steel tortuously interfered with its contract with Farm Credit. Daniel and Denise specifically argue in their third assignment of error that they presented evidence at trial from which reasonable minds could conclude only that "Universal's breach of contract occurred first and was material, thus excusing Dues from further performance under the contract." (Appellant's/Cross-Appellee's Brief at 16).

*Standard of Review*

{¶104} This court reviews "de novo a trial court's decision to grant or deny a Civ.R. 50(B) motion for" JNOV. *H & C Ag Servs., LLC v. Ohio Fresh Eggs, LLC*, 3d Dist. Hardin No. 6-15-02, 2015-Ohio-3714, ¶ 31. "De novo review is independent and without deference to the trial court's determination." *ISHA, Inc. v. Risser*, 3d Dist. Allen No. 1-12-47, 2013-Ohio-2149, ¶ 25.

*Analysis*

{¶105} "'A JNOV is proper if upon viewing the evidence in a light most favorable to the nonmoving party and presuming any doubt to favor the nonmoving party, reasonable minds could come to but one conclusion, that being in favor of the moving party.'" *H & C Ag Servs.* at ¶ 31, quoting *First Fed. Bank of Ohio v. Angelini*, 3d Dist. Crawford No. 3-11-11, 2012-Ohio-2137, ¶ 9. "'Such a decision does not determine factual issues, but only questions of law, even though it is necessary to review and consider the evidence in deciding the motion.'" *Id.*, quoting *Angelini* at ¶ 8. "'"Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination in ruling upon [JNOV]."'" *Id.*, quoting *Angelini* at ¶ 8, quoting *Osler v. Lorain*, 28 Ohio St.3d 345, 347 (1986).

*Universal Steel's JNOV*

{¶106} In this case, the trial court granted Universal Steel's motion for JNOV after concluding that Daniel and Denise did not present evidence from which a reasonable jury could find that Universal Steel intentionally or improperly procured a breach of contract between the Dues family and Farm Credit. Further, the trial court concluded that Daniel and Denise failed to demonstrate that Universal Steel's conduct was unjustified since Universal Steel's "filing a mechanics [sic] lien to collect the balance of the contract money owed" constituted a proper legal procedure. (Doc. No. 428).

{¶107} On appeal, Daniel and Denise argue that the trial court erred by granting Universal Steel's JNOV because they presented evidence from which

reasonable minds could conclude that Universal Steel's "interference with the contracts between the Dues and Farm Credit was improper or unjustified" since Universal Steel "knew from the outset of the litigation that its mechanics [sic] lien was defective as it was filed on the wrong property." (Appellant's/Cross-Appellee's Brief at 11). Furthermore, Daniel and Denise argue that they presented evidence from which reasonable minds could conclude that Universal Steel's interference with its contract with Farm Credit was improper and unjustified since it was "aware that if [it] did not stipulate to the more than obvious priority of Farm Credit's interest, the Dues would be in breach of contract and would be obligated to pay Farm Credit's attorney's fees" and that "even after the lien was declared defective, [it failed] to timely remove the lien." (*Id.*). Critically, Daniel and Denise argue that the trial court "incorrectly presumed the initial filing of the defective mechanics [sic] lien was the basis for" their argument but that they "always maintained the tortious conduct was Universal's refusal to release the lien * * * ." (*Id.* at 13).

{¶108} Universal Steel disputes Daniel and Denise's argument and contends that there was no evidence presented from which a reasonable jury could conclude that it "acted with intent to procure the breach of Dues' relationship with Farm Credit" or that it lacked justification. (Appellee's/Cross-Appellant's Brief at 29). Specifically, Universal Steel contends that it was justified in its conduct since it was statutorily permitted to "attach [a lien] to an adjacent property operated as one general concern * * * ." (Appellee's/Cross-Appellant's Brief at 24).

{¶109} The tort of "[t]ortious interference with a contract occurs 'when a person, without a privilege to do so, induces or otherwise purposely causes a third person * * * not to perform a contract with another.'" *Gentile v. Turkoly*, 7th Dist. Mahoning No. 16 MA 0071, 2017-Ohio-1018, ¶ 23, quoting *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995). "The tort of interference with existing * * * contractual relations includes * * * making that performance more expensive or burdensome * * *." Restatement of the Law 2d, Torts, Section 767 (1979). "'The rule applies * * * to an interference that is incidental to the actor's independent purpose and desire but known to him as a necessary consequence of his action.'" *Ginn v. Stonecreek Dental Care*, 12th Dist. Fayette No. CA2014-06-015, 2015-Ohio-1600, ¶ 17, quoting Restatement, Section 766, Comment j.

{¶110} The elements of the tort of tortious interference with a contract include "'(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.'" *Inwood Village, Ltd. v. Christ Hosp.*, 1st Dist. Hamilton No. C-110730, 2012-Ohio-3434, ¶ 9, quoting *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St.3d 171, 176 (1999). "In order to prevail, a party must demonstrate that the wrongdoer intentionally and improperly interfered with its contractual relations with another." *Gentile* at ¶ 23.

{¶111} "'Establishment of the fourth element of the tort of tortious interference with contract, lack of justification, requires proof that the defendant's interference with another's contract was improper.'" *Long v. Mt. Carmel Health Sys.*, 10th Dist. Franklin No. 16AP-511, 2017-Ohio-5522, ¶ 26, quoting *Fred Siegel* at paragraph two of the syllabus. A "lack of justification, can be defeated by a privilege to interfere with a contract to assert a legally protected interest." *Bridge v. Park Natl. Bank*, 179 Ohio App.3d 761, 2008-Ohio-6607, ¶ 25 (10th Dist.). Specifically, a party "is privileged to purposely cause another not to perform a contract with a third person where the defendant, in good faith, is asserting a legally protected interest of his own which he believes will be impaired or destroyed by the performance of the contract." *Id.*

{¶112} "Whether the interference is justified is a fact-specific determination based on the particular circumstances." *Id.* at ¶ 26. When determining whether an interference is justified, a court must consider

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Id.* However, "Ohio law places the burden of proving 'lack of privilege' or 'improper justification' on the plaintiff." *Melohn Cos., Inc. v. AmeriFirst Financial Corp.*, N.D.Ohio No. 1:17 CV 1303, 2018 WL 1991720, *5 (Apr. 26, 2018), quoting

*Super Sulky, Inc. v. United States Trotting Assn.*, 174 F.3d 733, 742 (6th Cir.1999). Furthermore, "'Ohio law recognizes that a plaintiff may recover all damages proximately caused by an actor's misconduct in a tortious interference action.'" *Lump v. Larson*, 3d Dist. Logan No. 8-14-14, 2015-Ohio-469, ¶ 12, quoting *UZ Engineered Prods. Co. v. Midwest Motor Supply Co., Inc.*, 147 Ohio App.3d 382, 2001-Ohio-8779, ¶ 54 (10th Dist.).

{¶113} Universal Steel conflates the issue underlying Daniel and Denise's first assignment of error. The issue is not whether Universal Steel were justified in filing a mechanic's lien; rather, the specific issues presented to the jury was whether Universal Steel was *justified* in maintaining its defective mechanic's lien and whether it was *justified* in refusing to stipulate to Farm Credit's priority. Based on our de novo review of the record, we conclude that Universal Steel tortuously interfered with Daniel and Denise's contract with Farm Credit. Specifically, we conclude that Daniel and Denise presented evidence from which reasonable minds could conclude that Universal Steel intentionally interfered (without privilege or justification) with the contractual relationship between the Dues family and Farm Credit and that the Dues family was damaged by such conduct.

{¶114} Simply put, there is no dispute that a party would be justified by pursuing its legal remedies, including filing a mechanic's lien. Indeed, in this case, Universal Steel would have been justified by filing a mechanic's lien on the 4212 property. However, Universal Steel was divested of any privilege when it filed the

mechanic's lien on the 4300 property and thereafter refused to remove the defective mechanic's lien or stipulate to Farm Credit's priority. *Compare Donald G. Culp Co. v. Reliable Stores Corp.*, 14 Ohio App.3d 161, 164 (10th Dist.1983) (concluding that the refusal to consent to a sublease unless a restoration bond was provided did not constitute tortious interference with a contract since the requested bond was reasonably designed to protect the owner's interest).

{¶115} Furthermore, Universal Steel's contention that it was justified (as a matter of law) in pursuing its defective mechanic's lien under R.C. 1311.08 does not reinstate its privilege. Critically, "[b]y its very wording, [R.C. 1311.08] is only applicable when the contractor has done work on more than one tract or parcel." *Mack Industries, Inc. v. Buckeye Diggers, Inc.*, 11th Dist. Lake No. 92-L-082, 1993 WL 548113, *8 (Dec. 10, 1993). Universal Steel unequivocally performed work only on the 4212 property and did not perform any work on the 4300 property.

{¶116} Consequently, whether Universal Steel was justified in intentionally *maintaining* a defective mechanic's lien on the 4300 property and whether it was justified in refusing to stipulate to Farm Credit's priority (based on the defective mechanic's lien) are factual determinations for a jury to decide. *See CajunLand Pizza, LLC v. Marco's Franchising, LLC*, N.D.Ohio No. 3:20-CV-536-JGC, 2021 WL 9166417, *9 (June 8, 2021), fn. 4; *Bridge*, 179 Ohio App.3d 761, 2008-Ohio-6607, at ¶ 28. Importantly, Daniel and Denise presented evidence at trial from

which the jury could have concluded that the mechanic's lien disturbed their contractual relationship with Farm Credit.

{¶117} In particular, Daniel and Denise presented evidence during their case-in-chief that, as a result of the mechanic's lien, their account was transferred to Farm Credit's special-accounts division in Washington Courthouse, Ohio. Daniel testified that, as a result of the transfer of their account, the Farm Credit branch in Celina (at which the Dues family conducted business) would "not talk to" them. (July 26-29, 2022 Tr., Vol. III, at 495). Furthermore, Daniel and Denise presented evidence that Farm Credit accelerated their repayment of the promissory note for the dairy-barn project, requiring that they "pay it back in 30 days," removed their ability to write checks from the account, cancelled their line of credit, and increased "the interest rate up [over] 8 * * * percent." (*Id.* at 499). Daniel further testified that the mechanic's lien prevented them from finishing the flush system for the barn as well as "other things around the farm." (*Id.* at 496).

{¶118} Likewise, Kremer identified a January 12, 2018 letter of concern that Farm Credit sent to Daniel, Denise, and Kyle following an annual financial review performed on the Dues family's accounts, which warned them that the concerns identified in the letter could have an impact on their financing with Farm Credit. Generally, Kremer testified that Farm Credit identified the "litigation status [of this case] and its short and long-term implications on [the Dues family's] financial well-being" as a concern. (July 26-29, 2022 Tr., Vol. V, at 860). Critically, Kremer

testified that she met with the Dues family following the transmission of the letter of concern and informed them that "due to the mechanic's lien being filed and the litigation," Farm Credit "would need to stop draws on th[e] loan until things were * * * resolved." (*Id.* at 866-867).

{¶119} Critically, Daniel and Denise also presented evidence that Universal Steel knew that its mechanic's lien was defective. Specifically, Donovan testified that

> the mechanic's lien was filed against property that was never improved, so [Universal Steel] filed it against the wrong property, which they knew about very quickly because [Farm Credit] brought it to everyone's attention. Which at that point, [Donovan] assume[d] [Universal Steel] would have released it as * * * the whole point of a mechanic's lien is * * * to improve the real estate. That's why [a party is] given that * * * lien right.

(July 26-29, 2022 Tr., Vol. IV, at 779-780). Further, Donovan informed the jury that "a mechanic's lien that's recorded on unimproved property for [sic] the wrong property, is * * * defective immediately." (*Id.* at 780).

{¶120} Daniel and Denise presented evidence that Farm Credit requested Universal Steel to stipulate to its "lien priority that Farm Credit was first in front of the mechanic's lien." (*Id.* at 776). Specifically, Donovan testified that, even though such stipulation was proposed by the trial court, Universal Steel refused (without explanation) to stipulate to the lien priority. Donovan testified that he "thought [Universal Steel was] acting unreasonable" since he "didn't see any reason that they shouldn't stipulate. That's common practice." (*Id.* at 777). Likewise, Bernlohr

acknowledged that the mechanic's lien was defective because it was filed on the wrong property since "if you file a lien on one property, * * * it has to absolutely be on the property where the project is." (July 26-29, 2022 Tr., Vol. V, at 907).

{¶121} Daniel and Denise also presented evidence that Farm Credit assessed its attorney fees associated with litigating the mechanic's lien to their account. Specifically, Donovan testified that, because Universal Steel refused to stipulate to the lien priority, Farm Credit's [attorney] fees [were] assessed to the Dues' account"—namely, $9,751.39. (July 26-29, 2022 Tr., Vol. IV, at 779).

{¶122} Thus, since whether Universal Steel was justified in intentionally maintaining a defective mechanic's lien on the 4300 property and whether it was justified in refusing to stipulate to Farm Credit's priority are questions of fact, we conclude that the trial court erred by granting a JNOV in favor of Universal Steel as to Daniel and Denise's counterclaim for tortious interference with a contract. Therefore, viewing the evidence in a light most favorable to the nonmoving party, we conclude that reasonable minds could resolve only that Universal Steel tortuously interfered with the Dues family's contract with Farm Credit. Thus, Daniel and Denise's first assignment of error is sustained.

*Daniel and Denise's JNOV*

{¶123} Having concluded that the trial court erred by granting Universal Steel's JNOV motion, we turn to Daniel and Denise's argument that the trial court erred by denying their JNOV motion as to Universal Steel's breach-of-contract

claim. "'"A contract is an agreement, upon sufficient consideration, between two or more persons to do or not to do a particular thing."'" *Powell v. Grant Med. Ctr.*, 148 Ohio App.3d 1, 2002-Ohio-443, ¶ 27 (10th Dist.), quoting *Nilavar v. Osborn*, 137 Ohio App.3d 469, 483 (2d Dist.2000), quoting *Lawler v. Burt*, 7 Ohio St. 340, 350 (1857). "'"[B]reach," as applied to contracts is defined as a failure without legal excuse to perform any promise which forms a whole or part of a contract, including the refusal of a party to recognize the existence of the contract or the doing of something inconsistent with its existence.'" *Whitt Sturtevant, LLP v. NC Plaza LLC*, 10th Dist. Franklin No. 14AP-919, 2015-Ohio-3976, ¶ 29, quoting *Hanna v. Groom*, 10th Dist. Franklin No. 07AP-502, 2008-Ohio-765, ¶ 14, quoting *Natl. City Bank of Cleveland v. Erskine & Sons*, 158 Ohio St. 450 (1953), paragraph one of the syllabus. Thus, to recover on "a breach-of-contract claim, a plaintiff must prove '"the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff."'" *Powell* at ¶ 27, quoting *Nilavar* at 483, quoting *Doner v. Snapp*, 98 Ohio App.3d 597, 600 (2d Dist.1994).

{¶124} Importantly, "[i]n order to prove a breach by the defendant, a plaintiff must show that the defendant 'did not perform one or more of the terms of the contract.'" *Jarupan v. Hanna*, 173 Ohio App.3d 284, 2007-Ohio-5081, ¶ 18 (10th Dist.), quoting *Little Eagle Properties v. Ryan*, 10th Dist. Franklin No. 03AP-923, 2004-Ohio-3830, ¶ 15. However, "[a]s a general rule, a party does not breach a contract when that party substantially performs the terms of the contract." *Whitt*

*Sturtevant* at ¶ 29.  That is, "[n]ominal, trifling, or technical departures from the terms of a contract are not sufficient to breach it."  *Id.*  Consequently, under "'the law of contracts, "substantial performance" is [an] approximation of full performance such that the parties obtain, in the main, what the contract called for, although it is not complete and final performance in every particular.'" *Oberlin v. Lorain Cty. Joint Vocational School Dist. Bd. of Edn.*, 9th Dist. Lorain No. 18CA011338, 2019-Ohio-3977, ¶ 22, quoting *Stone Excavating, Inc. v. Newmark Homes, Inc.*, 2d Dist. Montgomery No. 20307, 2004-Ohio-4119, ¶ 13.

{¶125} However, "a material breach of contract will entitle a party to stop performance." *Marion Family YMCA v. Hensel*, 178 Ohio App.3d 140, 2008-Ohio-4413, ¶ 7 (3d Dist.).  "A material breach is a breach essential to the purpose of the contract." *Whitt Sturtevant* at ¶ 30.  To constitute a material breach of contract, the breach must be "a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Marion Family YMCA* at ¶ 7.  "The determination of whether a party's breach of a contract was a 'material breach' is generally a question of fact." *Whitt Sturtevant* at ¶ 30, quoting *O'Brien v. Ohio State Univ.*, 10th Dist. Franklin No. 06AP-946, 2007-Ohio-4833, ¶ 11.

{¶126} Here, the parties do not dispute the existence of a contract.  Instead, the parties dispute whether Daniel and Denise preserved their argument that they were excused from performing under the contract because Universal Steel's breach

of the contract constituted a prior material breach. Specifically, Daniel and Denise contend that "[t]he Jury's verdict in favor of Universal was improper given that Universal had previously committed a material breach of the contract by delivering non-conforming goods, thereby excusing Dues from further performance as a matter of law." (Appellant's/Cross-Appellee's Reply Brief at 16).

{¶127} "'Ohio is a notice-pleading state.'" *Hall v. Crawford Cty. Job & Family Servs.*, 3d Dist. Crawford No. 3-21-19, 2022-Ohio-1358, ¶ 16, quoting *Pugh v. Sloan*, 11th Dist. Ashtabula No. 2019-A-0031, 2019-Ohio-3615, ¶ 26. To properly preserve a claim, counterclaim, or affirmative defense in a civil action, "Civ.R. 8(A) requires 'a short and plain statement of the claim showing that the party is entitled to relief.'" *Truist Bank v. Eichenberger*, 10th Dist. Franklin No. 22AP-334, 2023-Ohio-779, ¶ 51, quoting Civ.R. 8(A). *See also Reed v. Multi-Cty. Juvenile Sys.*, 7th Dist. Columbiana No. 09 CO 27, 2010-Ohio-6602, ¶ 47 (noting that "[p]ursuant to the liberal pleading requirements of Civ .R. 8, the pleadings of the parties to an action need only be in general terms" and that "[a] defendant's answer is subject to the same notice-pleading standards as a plaintiff's complaint, and an affirmative defense is generally adequate as long as the plaintiff receives fair notice of the defense. Civ.R. 8(C)"). "Notice pleading under Civ.R. 8(A) and (E) requires that a claim concisely set forth only those operative facts sufficient to give fair notice of the nature of the action." *Truist Bank* at ¶ 51, citing *Ford v. Brooks*, 10th Dist. Franklin No. 11AP-664, 2012-Ohio-943, ¶ 13. Importantly, "to constitute

fair notice, the complaint (or counterclaim) must allege sufficient underlying facts that relate to and support the alleged claim; it may not simply state legal conclusions." *Id.*, citing *Montgomery v. Ohio State Univ.*, 10th Dist. Franklin No. 11AP-1024, 2012-Ohio-5489, ¶ 20.

{¶128} Similarly, "Civ.R. 8(C) governs the pleading of affirmative defenses" and provides in its relevant part that, "'[i]n pleading to a preceding pleading, a party shall set forth affirmatively * * * any * * * matter constituting an avoidance or affirmative defense.'" *Id.* at ¶ 52, quoting Civ.R. 8(C). "To preserve an affirmative defense, a party must assert it in at least one of the following ways: (1) by motion before pleading pursuant to Civ.R. 12(B); (2) affirmatively in a responsive pleading pursuant to Civ.R. 8(C); or (3) by amendment made under Civ.R. 15." *Id.*, citing *Marok v. Ohio State Univ.*, 10th Dist. Franklin No. 07AP-921, 2008-Ohio-3170, ¶ 11, citing *Mills v. Whitehouse Trucking Co.*, 40 Ohio St.2d 55 (1974), syllabus.

{¶129} A party's "[f]ailure to set forth an affirmative defense, other than those listed in Civ.R. 12(B), acts as a waiver if the defense was not raised in the pleadings or in an amendment to the pleadings.'" *Oberlin*, 2019-Ohio-3977, at ¶ 20, quoting *Matrix Acquisitions, L.L.C. v. Manley*, 9th Dist. Summit No. 27191, 2014-Ohio-2860, ¶ 9. *See also Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427 (1996), syllabus (noting that the failure to raise an affirmative defense "before or during trial [also] precludes the defendant from raising the defense for the first time in a motion for judgment notwithstanding the verdict").

However, "Civ.R. 8(F) states that the pleadings of the parties are to be 'construed as to do substantial justice,' which further supports the notion that pleadings should be construed in order to dispose of cases on their merits rather than technicalities." *Reed* at ¶ 42. Critically, "[i]f a party raises a 'generic' defense in its answer, it is acceptable to make fair interpolations of more specific defenses that might naturally be included in that defense." *Id.* at ¶ 47, citing *Gallagher* at 432-433.

{¶130} Likewise, "'[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.'" *Church at Warren v. Warzala*, 11th Dist. Trumbull No. 2016-T-0073, 2017-Ohio-6947, ¶ 19, quoting Civ.R. 15(B). "Implied consent is established where it appears 'the parties understood the evidence was aimed at the unpleaded issue.'" *Id.*, quoting *State ex rel. Evans v. Bainbridge Twp. Trustees*, 5 Ohio St.3d 41 (1983), paragraph two of the syllabus.

{¶131} "'An affirmative defense assumes the allegations in the complaint to be true, but constitutes a defense to them.'" *Oberlin* at ¶ 21, quoting *Aquatic Renovations Sys., Inc. v. Walbridge*, 6th Dist. Wood No. WD-17-038, 2018-Ohio-1430, ¶ 27. "Specifically, '[a]n affirmative defense is any defensive matter in the nature of a confession and avoidance. It admits that the plaintiff has a claim (the "confession") but asserts some legal reason why the plaintiff cannot have any recovery on that claim (the "avoidance").'" *Id.*, quoting *State ex rel. The Plain Dealer Publishing Co. v. Cleveland*, 75 Ohio St.3d 31, 33 (1996). "The purpose for

requiring the timely pleading of affirmative defenses is to avoid surprise at trial." *Reed* at ¶ 42.

**{¶132}** The defense of "prior material breach" is an affirmative defense to a contract claim. *See Olentangy Condominium Assn. v. Lusk*, 10th Dist. Franklin No. 09AP-568, 2010-Ohio-1023, ¶ 29; *Knisley v. Knauff*, 4th Dist. Pike No. 95CA559, 1996 WL 571484, *2 (Oct. 2, 1996). "'The burden of proving an affirmative defense rests with the party raising the defense." *Nationstar Mtge., LLC v. Mielcarek*, 9th Dist. Lorain No. 15CA10748, 2016-Ohio-60, ¶ 11, quoting *First Natl. Bank of Ohio v. Cassell*, 9th Dist. Summit No. 16823, 1995 WL 134775, *2 (Mar. 29, 1995).

**{¶133}** Our review of record reveals that the Dues family did not specifically use the phrase "prior material breach" in their pleadings. Nevertheless, our review of the Dues family's pleadings reveals that they pleaded defenses from which fair interpolations of the more specific defense of prior material breach can be deduced. Specifically, the Dues family asserted in their October 5, 2021 answer that they were excused from performing under the contract due to Universal Steel's "own breach of contract and failure to perform in a workmanlike manner"; Universal Steel's "unilateral termination, rescission, and/or repudiation of contract"; and Universal Steel's "failure to perform under contract." (Doc. No. 297). *Accord Oxford Mining Co., LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 19 BE 0016, 2020-Ohio-1363, ¶ 27. Likewise, the Dues family raised the issue of prior material breach

at the summary-judgment stage. (*See* Doc. No. 144). *Compare Oxford Mining* at ¶ 29.

**{¶134}** Furthermore, our review of the evidence presented at trial reflects that the parties understood that they were litigating whether the Dues family was excused from performance under the contract because of Universal Steel's breach of the contract. Indeed, Daniel testified that he instructed Farm Credit "to cancel the[] three checks" that he tendered to Universal Steel "because [the last load of steel] was 6000 pounds short," "[t]here was something missing," and he "wanted an answer." (July 26-29, 2022 Tr., Vol. III, at 481). In particular, Daniel explained that the "bill of lading weight didn't match what * * * Universal Steel said the building was going to weigh, on [the] pre-build packet." (*Id.* at 475).

**{¶135}** Daniel and Denise presented further evidence that the weight deficiency resulted in the barn being constructed without either of the 20 by 14 foot openings as called for in the parties' contract. As to the door height, Daniel and Kyle testified that they were able execute a field adjustment and achieve one of the 20 by 14 foot openings on the south end of the barn but that they could not replicate the adjustment for the opening at the northeast corner. According to Daniel, they were unable to field adjust the opening at the northeast corner of the barn because the roof is "too short." (*Id.* at 472). Instead, the height of the door in the northeast corner of the barn is only "11 foot 9, with no header or anything in it." (July 26-29, 2022 Tr., Vol. II, at 391).

{¶136} Nevertheless, Daniel and Denise presented evidence that neither of the openings on which they conducted field adjustments appear as they were intended to appear. Specifically, the "south side does not match the north side" because there was "a canopy on the north side and the south side, but [they] had to take the south whole canopy across the whole end of the barn, lift it up 4 feet, and [they] had to jerry-rig the ends to match the other roof sloping down * * * ." (July 26-29, 2022 Tr., Vol. III, at 473).

{¶137} Moreover, Kyle testified that the barn not only "definitely [does not look] how it's supposed to look," but that they have been unable to use it as intended. (*Id.* at 383). In particular, Daniel described that the opening at the northeast corner of the barn is the "main [entrance] to the manure storage, and that's what truly is the end of the feed aisle, where [they] run feed wagons in there every day." (July 26-29, 2022 Tr., Vol. III, at 472). However, Kyle testified that they are unable to use the dry-manure management system because they "were supposed to be able to drive a semi in to load it, and [they] cannot do that" since "the building was not built correctly." (July 26-29, 2022 Tr., Vol. II, at 378). To demonstrate, the Dues family presented video evidence reflecting that a trailer will not fit through the opening in the northeast corner of the barn. (*See* Defendant's Ex. MM). Similarly, Craig testified that the barn, as built, did not provide the necessary updraft for ventilation because "the steel legs [are] short." (July 26-29, 2022 Tr., Vol. III, at 442).

**{¶138}** Consequently, the specific facts and circumstances of this case demonstrate that the parties understood that the evidence presented was aimed at whether the Dues family was excused from performance as a result of Universal Steel's breach of the contract. However, even though Daniel and Denise presented such evidence, Universal Steel maintains that Daniel and Denise waived "any argument that the verdict should be set aside based on a material breach" because Daniel and Denise failed to request that the jury consider whether Universal Steel's prior breech was material. (Appellee's/Cross-Appellant's Brief at 32). Generally, "[t]he failure to request a jury instruction on the law governing a particular defense constitutes a waiver of the defense." *Black v. Hicks*, 8th Dist. Cuyahoga No. 108958, 2020-Ohio-3976, ¶ 84. "[U]nder Civ.R. 51(A), a party 'may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict.'" *McNeil v. Kingsley*, 178 Ohio App.3d 674, 2008-Ohio-5536, ¶ 22 (3d Dist.), quoting Civ.R. 51(A).

**{¶139}** Nevertheless, Daniel and Denise contend that they preserved their argument by objecting "to the trial court's failure to include an instruction on frustration of purpose" because "[a] finding in favor of [the] Dues on the issue of frustration of purpose would have been a finding of material breach." (Appellant's/Cross-Appellee's Reply Brief at 17). Generally, [a]ppellate review of a trial court's refusal to give a party's requested jury instructions entails a determination whether, under the facts and circumstances of the case, the trial court

-66-

abused its discretion." *Stuller v. Price*, 10th Dist. Franklin No. 03AP-66, 2004-Ohio-4416, ¶ 93. An abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶140} "Frustration of purpose occurs when one of the two parties to a contract creates a situation where the basis of the parties' contract essentially becomes moot." *Ams. Floor Source, L.L.C. v. Homes*, 191 Ohio App.3d 493, 2010-Ohio-6296, ¶ 37 (10th Dist.). In general, "frustration of purpose could be described as a form of breach of contract" "[i]f a party to a contract creates a situation whereby it cannot fulfill its obligations under the contract * * * ." *Id.* at ¶ 38.

{¶141} Many of our sister courts of appeal, "have noted that the doctrine of frustration of purpose is not widely accepted in Ohio." *Wroblesky v. Hughley*, 11th Dist. Trumbull No. 2020-T-0044, 2021-Ohio-1063, ¶ 54. This court has not adopted the doctrine. *See Am. Premier Underwriters, Inc. v. Marathon Pipe Line Co.*, 3d Dist. Mercer No. 10-01-08, 2002 WL 437998, *4 (Mar. 20, 2002). However, we need not revisit the doctrine's viability in this case since "[f]rustration of purpose is wholly inapplicable to this case * * * ." *Trustees of Colorado Statewide Iron Workers (ERECTOR) Joint Apprenticeship & Training Tr. Fund v. A & P Steel, Inc.*, 812 F.2d 1518, 1523 (10th Cir.1987). That is, "[t]he doctrine deals with situations where supervening events destroy or alter the foundation of the contract."

*Id.* There is no allegation that a supervening event destroyed or altered the foundation of the contract in this case.

**{¶142}** Notwithstanding their argument that they properly preserved the issue, Daniel and Denise suggest that, "even if [the] Dues had failed to raise the issue below, a finding of breach of contract in favor or a materially breaching party would constitute plain-error * * * ." (Appellant's/Cross-Appellee's Reply Brief at 17). Typically, plain error "is a judicially created exception to Civ.R. 51(A) and it allows for a 'review of alleged errors not properly objected to in the trial court, where the errors are so fundamental and serious so as to affect "the basic fairness, integrity, or public reputation of the judicial process."'" *McNeil*, 178 Ohio App.3d 674, 2008-Ohio-5536, at ¶ 24, quoting *Gonzalez v. Henceroth Ents., Inc.*, 135 Ohio App.3d 646, 650, (9th Dist.1999), quoting *Yungwirth v. McAvoy*, 32 Ohio St.2d 285, 288 (1972).

**{¶143}** Even if we assume without deciding that Daniel and Denise did not properly preserve their argument, we conclude that the trial court's failure to instruct the jury as to the prior-material-breach issue rises to the level plain error. Indeed, based on our review of the record (along with the evidence presented at trial), it is evident to us that the parties were litigating whether the Dues family was excused from performance under the contract as a result of Universal Steel's breach of the contract.

{¶144} Consequently, since the record and the evidence presented at trial necessitated a prior-material-breach instruction, we conclude that the trial court erred by denying Daniel and Denise's JNOV motion. That is, based on our review of the evidence presented (in a light most favorable to Universal Steel), we conclude that reasonable minds can conclude only that Universal Steel's breach of the contract constituted a prior material breach and that the Dues family was excused from further performance under the contract. Critically, Daniel and Denise presented evidence that Universal Steel failed to deliver a barn with the openings that the parties contracted for and that such failure defeated the essential purpose of the contract. Consequently, we conclude that the trial court erred by denying Daniel and Denise's JNOV motion.

{¶145} Therefore, Daniel and Denise's third assignment is sustained.

**Daniel and Denise's Second Assignment of Error**

**The Trial Court Erred By Granting Universal's Motion For Directed Verdict As To Punitive Damages on Dues' Claim For Tortious Interference With a Contractual Relationship**

{¶146} In their second assignment of error, Daniel and Denise argue that the trial court erred by granting Universal Steel's motion for directed verdict as to their counterclaim for punitive damages. Specifically, Daniel and Denise contend that they presented sufficient evidence that Universal Steel acted with malice by "failing to remove the defective lien when promptly notified of its facial defect, [that it] violated R.C. 1311.20 by not removing the lien within 30 days after the trial court invalidated the lien, and [that it] refused to stipulate to Farm Credit's lien priority." (Appellant's/Cross-Appellee's Brief at 15).

*Standard of Review*

{¶147} "A motion for a directed verdict presents a question of law." *Clements v. Lima Mem. Hosp.*, 3d Dist. Allen No. 1-09-24, 2010-Ohio-602, ¶ 53. That is, a motion for a directed verdict raises questions of law, not factual issues, because it tests whether the evidence is legally sufficient to allow the case to be presented to the jury for deliberation." *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 37 (10th Dist.). Therefore, we review de novo a trial court's decision to grant or deny a motion for directed verdict. *Bryant v. Gen. Motors Corp.*, 3d Dist. Defiance No. 4-15-03, 2015-Ohio-4911, ¶ 10. Again, "[d]e novo review is

independent and without deference to the trial court's determination." *ISHA, Inc.*, 2013-Ohio-2149, at ¶ 25.

*Analysis*

**{¶148}** "Civ.R. 50(A)(4) provides that a trial court shall grant a party's motion for directed verdict if, after construing the evidence most strongly in favor of the non-moving party, 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to [the non-moving party].'" *Clements* at ¶ 53, quoting Civ.R. 50(A)(4). "In making this determination, the trial court must decide whether the non-moving party presented evidence of substantial probative value in support of its claim." *Id.* "It is clear that 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied.'" *Id.*, quoting *Ramage v. Cent. Ohio Emergency Serv., Inc.*, 64 Ohio St.3d 97, 109 (1992). "If the non-moving party cannot present 'substantial competent evidence' from which reasonable minds could draw different conclusions, then the motion should be granted." *Id.*, quoting *Shreve v. United Elec. & Constr. Co. Inc.*, 4th Dist. Ross No. 01CA2626, 2002-Ohio-3761, ¶ 26. Importantly, "[t]he court's disposition of the motion thus does not involve weighing the evidence or the credibility of the witnesses." *Reeves* at ¶ 37.

**{¶149}** "In Ohio, punitive damages may be awarded in tort actions involving fraud, malice, or insult." *Gibbons v. Shalodi*, 9th Dist. Lorain No. 19CA011586,

2021-Ohio-1910, ¶ 52. *See also* R.C. 2315.21(C)(1). "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Burns v. Prudential Secs., Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, ¶ 98 (3d Dist.). "Accordingly, an award of punitive damages requires something more than a showing of mere negligence." *Id.* Therefore, a plaintiff must demonstrate by clear and convincing evidence that he or she is entitled to recover punitive damages. *Id.*, citing R.C. 2315.21(D)(4). "The amount of punitive damages to be awarded, however, is an issue for the jury to determine." *Id.*

{¶150} When malice is the alleged basis, "punitive damages are permitted only when the actions or omissions of a defendant demonstrate actual malice, and the plaintiff proves actual damages as a result of those actions or omissions." *Id.* at ¶ 99. Importantly, "key to the recovery of punitive damages in Ohio is a finding of malice, and a claim based on negligence can provide the basis for an award of punitive damages if there is an adequate showing of actual malice." *Id.* at ¶ 101.

{¶151} "'Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" *Id.* at ¶ 102, quoting *Preston v. Murty*, 32 Ohio St.3d 334, 336 (1987). "'Inherent in the concept of actual malice is the notion that a wrongful act has been done without any plausible legal justification.'" *Long*, 2017-Ohio-5522, at ¶ 29, quoting *Ament v. Reassure*

*Am. Life Ins. Co.*, 180 Ohio App.3d 440, 2009-Ohio-36, ¶ 63 (8th Dist.). "[A]ctual malice can be inferred from conduct and surrounding circumstances that may be characterized as reckless, wanton, willful, or gross" since "'it is rarely possible to prove actual malice otherwise than by conduct and surrounding circumstances.'" *Burns* at ¶ 103, quoting *Davis v. Tunison*, 168 Ohio St. 471, 475 (1959). Importantly, "'a positive element of conscious wrongdoing is always required.'" *Id.* at ¶ 102, quoting *Preston* at 335.

{¶152} In this case, the trial court granted a directed verdict in favor of Universal Steel as to Daniel and Denise's counterclaim for punitive damages after concluding that "reasonable minds could only conclude that Universal did not act with actual malice * * * ." (Doc. No. 402). Specifically, the trial court determined that "the process of a lawsuit" is not "something that attributes to a callous mental state that is intolerable to society." (Aug. 5, 2022 Tr., Vol. VII, at 1211). "In other words, the [trial court concluded that] malice [cannot] arise, absent the normal process that occurs in a lawsuit, to be attributed to one party, and the evidence in this case fails to reveal that." (*Id.* at 1211-1212).

{¶153} On appeal, Daniel and Denise argue that the trial court erred by determining that "a party cannot engage in malicious conduct during the pendency of a lawsuit, regardless of the jury's findings." (Appellant's/Cross-Appellee's Brief at 16). Instead, Daniel and Denise assert that they presented sufficient evidence that "Universal [Steel] was aware its acts had a great probability of causing substantial

harm" since it "knew that its refusal to release the mechanics' [sic] lien would cause Dues' [sic] to be in breach of the Farm Credit Contract." (Appellant's/Cross-Appellee's Reply Brief at 14). Universal Steel disputes Daniel and Denise's argument and contends that "[t]he lien, the issues surrounding the lien, and Farm Credit's involvement in this matter were all the natural result of Dues' original refusal to pay" and that "[t]he actions taken by Universal [Steel] in this litigation were also the natural part of the adversarial litigation process * * * ." (Appellee's/Cross-Appellant's Brief at 26).

{¶154} Based on the specific facts and circumstances of this case, we conclude that the trial court erred by granting a directed verdict in favor of Universal Steel as to Daniel and Denise's punitive-damages claim. Specifically, as we analyzed in Daniel and Denise's third assignment of error, the issue is not whether Universal Steel was justified in filing a mechanic's lien; rather, the issues underlying Daniel and Denise's punitive-damages claim are whether Universal Steel was justified in maintaining its defective mechanic's lien and whether it was justified in refusing to stipulate to Farm Credit's priority. In other words, the issues underlying Daniel and Denise's punitive-damages claim are whether Universal Steel consciously disregarded the Dues family's rights by knowingly maintaining its defective mechanic's lien and by refusing to stipulate to Farm Credit's priority and whether Universal Steel knew that its conduct had a great probability of causing the

Dues family substantial harm. Consequently, whether Universal Steel's conduct constitutes actual malice is a factual determination *for a jury to resolve*.

**{¶155}** Indeed, our review of the record reveals that Daniel and Denise presented substantial and probative evidence from which reasonable minds might reach different conclusions as to whether Universal Steel acted with actual malice. That is, the record reveals that Daniel and Denise presented evidence from which a jury could conclude that Universal Steel knew that its conduct had a great probability of causing substantial harm to the Dues family. *See UZ Engineered Prods.*, 147 Ohio App.3d 382, 2001-Ohio-8779, at ¶ 62-63.

**{¶156}** Specifically, during the bifurcated punitive-damages hearing, Gutierrez testified that Universal Steel learned that the mechanic's lien was filed on the wrong property in September 2017—that is, Universal Steel learned that the mechanic's lien was defective soon after it was filed. Likewise, Gutierrez testified that, even though Universal Steel was aware that its mechanic's lien was defective, it decided to maintain the defective mechanic's lien until July 29, 2020—nearly three years after it was filed and three months after the trial court declared it to be defective. *Compare id.* at ¶ 63 (asserting that a "[d]efendant's knowledge, coupled with its actions in connection with plaintiff's former employees, demonstrates a conscious disregard for plaintiff's rights"). In other words, Daniel and Denise presented evidence that Universal Steel's conduct compelled Farm Credit to litigate a mechanic's lien that Universal Steel knew was defective. Furthermore, as we

discussed in Daniel and Denise's third assignment of error, Daniel and Denise presented evidence during trial of the harm caused by the defective mechanic's lien.

{¶157} As a result, based on the facts presented, we conclude that Daniel and Denise presented sufficient evidence that Universal Steel acted with actual malice to permit their counterclaim for punitive damages to be presented to a jury for deliberation. Therefore, we conclude that the trial court erred by granting a directed verdict in favor of Universal Steel as to Daniel and Denise's punitive-damages counterclaim.

{¶158} Thus, Daniel and Denise's second assignment of error is sustained.

### Universal Steel's First Assignment of Error

**The Trial Court Erred In Excluding The Deposition Testimony Of John Graber, Jonas Graber, and John Hilty From Being Introduced Under Civ.R. 32(A)(3).**

{¶159} In its first assignment of error, Universal Steel argues that the trial court abused its discretion by excluding John's, Jonas's, and Hilty's deposition testimonies. Specifically, Universal Steel contends that those deposition testimonies were admissible under Civ.R. 32(A)(3) since "the three men are residents of Indiana, and are therefore outside the subpoena power of the court." (Appellee's/Cross-Appellant's Brief at 12).

*Standard of Review*

{¶160} We review a decision on the admission or exclusion evidence, including deposition testimony, under an abuse-of-discretion standard. *Simpson v.*

*Kuchipudi*, 3d Dist. Allen No. 1-05-50, 2006-Ohio-5163, ¶ 9; *Sabath v. Sabath*, 11th Dist. Lake No. 2019-L-154, 2020-Ohio-4638, ¶ 36.  Again, an abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219 .

**{¶161}** However, even if a trial court abuses its discretion in the admission of evidence, "a reviewing court will not reverse unless the error affected a substantial right of the party at issue." C*offey v. Dolgencorp, Inc.*, 3d Dist. Defiance No. 4-06-25, 2007-Ohio-2274, ¶ 26.  *See also Sabath* at ¶ 43 (explaining that "the exclusion of evidence or testimony must result in material prejudice for reversal to be warranted").  "In that scenario, the error is harmless."  *Welly v. Welly*, 3d Dist. Seneca No. 13-15-15, 2015-Ohio-4804, ¶ 23, citing Civ.R. 61.

*Analysis*

**{¶162}** Civ.R. 32 provides the guidelines for the use of depositions in court proceedings and provides, in its relevant part, that "[e]very deposition intended to be presented as evidence must be filed at least one day before the day of trial or hearing unless for good cause shown the court permits a later filing."  Civ.R. 32(A). The rule further provides that

> [a]t the trial * * * , any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof * * * .

*Id.*  Specifically, under Civ.R. 32(A)(3),

[t]he deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds * * * that the witness is beyond the subpoena power of the court in which the action is pending or resides outside of the county in which the action is pending unless it appears that the absence of the witness was procured by the party offering the deposition * * * .

Civ.R. 32(A)(3)(b). "'It is well-established that the burden rests on the proponent of the deposition to satisfy the requirements of Civ.R. 32(A)(3).'" *Sabath* at ¶ 38, quoting *Schwartz v. Tedrick*, 8th Dist. Cuyahoga No. 102082, 2016-Ohio-1218, ¶ 45. Importantly, "'Civ.R. 32(A)(3), by its own terms, does not mandate the substitution of a deposition at trial.'" *Schwartz* at ¶ 45, quoting *Johnson v. Eitle*, 6th Dist. Lucas No. L-06-1247, 2007-Ohio-3315, ¶ 27. *See also Sabath* at ¶ 38 (noting that "[t]he discretion afforded to the trial court in applying Civ.R. 32(A)(3) in particular has been emphasized, with this court finding Civ.R. 32(A)(3) provides that depositions 'may' be used but not that they 'shall be' admitted as evidence").

**{¶163}** In this case, the trial court permitted Universal Steel to rely on the deposition transcripts "for impeachment purposes" "and not as substantive evidence itself, but for their utilization for credibility of the witness." (July 26-29, 2022 Tr., Vol. II, at 265). Specifically, the trial court reasoned that the depositions were "not anticipated as a perpetuation deposition, meaning the deposition was taken with the beginning understanding that it was going to be used at trial * * * ." (*Id.* at 264).

**{¶164}** Here, Universal Steel argues that the trial court abused its discretion by excluding the deposition testimonies since (1) it "requested the introduction of

these depositions pursuant to Civ.R. 32(A)(3), as the three men are residents of Indiana, and are therefore outside the subpoena power of the court"; (2) the "depositions had been conducted by Dues' counsel in July 2018, and the transcripts had been filed with the Court on January 12, 2022, prior to an earlier scheduled trial"; and (3) Universal Steel "attempted to obtain the men's attendance at trial, but they refused citing reasons related to their Amish faith." (Appellee's/Cross-Appellant's Brief at 12).

**{¶165}** Based on our review of the record, even if we assume without deciding that Universal Steel satisfied the circumstances which must be met under Civ.R. 32(A)(3), Universal Steel was not materially prejudiced by the exclusion of the deposition testimonies. That is, even if we assume without deciding that the transcripts were "filed 'at least one day before the day of trial' and the witness[es were] unable to appear," Universal Steel cannot demonstrate that the outcome of trial would have been different. *Sabath*, 2020-Ohio-4638, at ¶ 40.

**{¶166}** Here, Universal Steel contends that "[t]he exclusion of the depositions was materially prejudicial to" it because the men's testimonies "directly and plainly contradicted Dues' claim" since "[a]ll testified that it was Dan Dues who set the height of the foundation walls to provide greater air-flow to his cows and that *this* was what resulted in the doorways being too short." (Emphasis sic.) (Cross-Appellant's/Appellee's Brief at 16). Universal Steel's argument is without merit.

**{¶167}** Indeed, Universal Steel presented the deposition testimony for impeachment purposes during Daniel's cross-examination. *Stanley v. Ohio State Univ. Med. Ctr.*, 10th Dist. Franklin No. 12AP-999, 2013-Ohio-5140, ¶ 91 (concluding that the appellant failed "to demonstrate how prejudice resulted from the exclusion of the depositions" since "the statements from the depositions * * * were utilized by appellant to cross-examine the respective doctors and were heard by the trier of fact"). As a result, the jury heard the portion of [Hilty's] deposition testimony instructing Daniel that if he lowers the walls he will "lose the height of [the] door." (July 26-29 Tr., Vol. III, at 556). Likewise, the jury heard Daniel's response to that deposition testimony that he "didn't change the walls, [Hilty] didn't change the walls, John Hilty didn't change the walls. And [he] got a 2-foot wall in front of [his] cows just like industry is." (*Id.* at 557) In sum, Universal Steel was able to utilize the deposition testimony to discredit Daniel's testimony, but it is evident that the jury chose to credit Daniel's version of the events. Consequently, based on the facts and circumstances before us, we cannot say that the outcome of trial would have been different.

**{¶168}** Nevertheless, Universal Steel contends that the trial court abused its discretion by excluding the deposition testimonies after concluding that "they were discovery depositions rather than trial depositions * * * ." (*Id.* at 14). However, based on our conclusion that Universal Steel cannot demonstrate that it was

materially prejudiced by the exclusion of the deposition testimonies, we need not reach this argument.

**{¶169}** For these reasons, Universal Steel's first assignment of error is overruled.

### Universal Steel's Second Assignment of Error

**The Jury's Finding In Favor Of The Dan Dues [sic] On His Breach Of Contract Claim Against Universal And Its Damages Award Of $256,500 Was Against The Manifest Weight Of The Evidence**

**{¶170}** In its second assignment of error, Universal Steel contends that the jury's verdict as to Daniel and Denise's breach-of-contract counterclaim is against the manifest weight of the evidence because "the jury lost its way, ignoring the plain and unambiguous provisions of the contract, the design plans, and the photographic evidence." (Appellee's/Cross-Appellant's Brief at 17). Specifically, Universal Steel argues that the jury not only lost its way by concluding that it breached the parties agreement but that it lost its way in awarding Daniel and Denise $256,500.00 in damages.

### *Standard of Review*

**{¶171}** "The standard of review for manifest weight is the same in a civil case as in a criminal case." *Yurkovich v. Kessler*, 6th Dist. Huron No. H-19-023, 2020-Ohio-4169, ¶ 30. It "'refers to a greater amount of credible evidence and relates to persuasion.'" *Snapp v. Castlebrook Builders, Inc.*, 3d Dist. Shelby No.

17-12-22, 2014-Ohio-163, ¶ 85, quoting *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19. "Under this standard, the reviewing court 'does not reweigh the evidence' but it applies the presumption that the jury's findings of fact are correct." *Id.*, quoting *Southeast Land Dev., Ltd. v. Primrose Mgt. L.L.C.*, 193 Ohio App.3d 465, 2011-Ohio-2341, ¶ 7 (3d Dist.).

{¶172} When applying the manifest-weight standard of review, the reviewing court reviews the entire record, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *Eastley* at ¶ 17, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Guagenti v. Guagenti*, 3d Dist. Allen No. 1-16-47, 2017-Ohio-2706, ¶ 53, quoting *Eastley* at ¶ 21.

*Analysis*

{¶173} As we previously stated, "[a] cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St.3d

453, 2018-Ohio-15, ¶ 41. In this case, the parties dispute whether Universal Steel breached the parties' contract by failing to provide the Dues family "a building with the contracted-for 14-foot high doorways." (Appellee's/Cross-Appellant's Brief at 17). Furthermore, Universal Steel contends that the "jury's finding and award of damages is against the manifest weight of the evidence * * * ." (*Id.*).

**{¶174}** On appeal, Universal Steel argues that the jury lost its way by concluding that it breached the parties' contract since it presented evidence that the Dues family was solely responsible for "the foundation design and construction" "[u]nder the clear terms of the contract" and that Universal Steel "did not have any involvement in the design or the construction of the concrete foundations for the barn. (*Id.* at 18). In other words, Universal Steel is asking this court to credit its expert witness's testimony over Daniel and Denise's expert witnesses' testimonies and conclude that it did not breach the parties' contract.

**{¶175}** However, we will not second-guess the jury's witness-credibility determination unless it is clear that the jury lost its way and a miscarriage of justice occurred. *See Logan v. Holcomb*, 3d Dist. Marion No. 9-12-61, 2013-Ohio-2047, ¶ 39. The trier of fact "occupies the best position to watch the witnesses and observe their demeanor, gestures and voice inflections and to utilize these observations in weighing credibility." *Sanford v. Griffin*, 7th Dist. Noble No. 22 NO 0491, 2023-Ohio-1917, ¶ 9, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Critically, "[a] reviewing court should not reverse a decision simply

because its opinion differs from the finder of fact's opinion concerning the credibility of the witnesses and evidence submitted." *Id.*, citing *Seasons Coal* at 81. After reviewing the evidence, we conclude that the jury did not lose its way and create such a manifest miscarriage of justice by concluding that Universal Steel breached the parties' contract that the judgment must be reversed and a new trial ordered.

{¶176} At trial, the jury heard the opinions of three expert witnesses who considered whether Universal Steel or the Dues family was responsible for the deficient door height of the barn. Universal Steel's expert witness, Lewin, testified that "everything in the barn was consistently lower than what it was called for on the design drawings." (July 26-29, 2022 Tr., Vol. V, at 968). Specifically, he testified that "the foundation for the building was built approximately two feet lower than it originally was called for in both the Rethman plans and the [Universal Steel] building plans." (*Id.* at 976). According to Lewin, based on his review of "the [Universal Steel] design plans and the Rethman design plans," the 14-foot measurement "goes from the bottom of the door head to the finished floor of the building." (*Id.* at 979). As a result, Lewin told the jury that he concluded that "the contractor * * * misinstalled the foundations that were wrong height." (*Id.* at 954).

{¶177} Nevertheless, the jury heard Lewin's testimony that his measurements were based "on the top of the floor slab at the northeast corner of the cow barn" since he did not take any measurements from the center of the barn. (*Id.*

at 986). Likewise, the jury heard Lewin's testimony that he was "unable to verify the slope of the concrete floor" when he inspected the barn since he did not take any measurements from the center of the barn. (*Id.* at 983).

{¶178} Daniel and Denise's expert witnesses, Schnippel and Core, testified that they concluded that Universal Steel was responsible for the deficient door height because it failed to consider the sloping floor slab when it drafted its plans for the barn. Indeed, Schnippel testified that Universal Steel's failure to consider the floor slope is what caused the deficient door heights. Specifically, the jury heard Schnippel's explanation that Universal Steel "constantly reference[s] to the bottom of [the] diagonal lines, which is a flat plain straight across. But when the floor slopes up, you're losing height. * * * The floor slab is sloping up towards the north and to the south [causing a loss of] two feet or three feet of elevation in those openings, and that's why [they did] not get[] the 14-foot tall opening there." (July 26-29, 2022 Tr., Vol. III, at 584). The jury further heard Schnippel's testimony that the error resulted from Universal Steel basing its dimensions on "the lowest part of the floor slab inside of the building." (*Id.* at 586).

{¶179} Similarly, Core testified that "the error was made by * * * Universal [Steel]" "[a]nd it was a dimensional error on the plans that led to that ultimate error in the manufacture of the building * * * to be too short." (July 26-29, 2022 Tr., Vol. IV, at 661). According to Core, Universal Steel made "[a] dimensional error on the plans, that instead of dimensioning the door opening, it dimensioned it at the right

size, but instead of dimensioning it at the top of the concrete foundation wall, it dimensioned it to the bottom of the concrete foundation wall, or the top of the footing, which makes * * * that opening size unattainable * * * ." (*Id.* at 673). He testified that "[t]he result is a 2 foot, 3 foot, or 4 foot reduction in height or clearance for the framed door openings in the side walls" and "a 2-foot reduction in height or clearance for the framed door openings in the south end wall." (*Id.* at 673-674). In sum, Core testified that Universal Steel's plans "call[]  for those doorways to be erroneously measured from the bottom of the foundation wall, rather than the top of the foundation wall," which resulted in the building being "too short," causing "modifications to the building to increase the height/clearance of the frame doorway." (*Id.* at 674-675).

{¶180} Moreover, Core testified that he reviewed Lewin's report and disagreed with his conclusions because Lewin based his measurements "on the top of the floor slab at the northeast corner of the cow barn," which is not the lowest portion of the concrete in the barn. (*Id.* at 684). Core further disputed Lewin's conclusion that "[t]he elevation differences established the concrete walls were not constructed in accordance with either the [Universal Steel] or Rethman drawings" because Lewin based his measurements off of the northeast corner of the barn instead of the middle (in which the lowest point of the barn is located). (*Id.* at 686). Core testified that, based on this conclusion, Lewin's measurements are off "exactly 2.19 feet." (*Id.* at 687).

{¶181} As a result of the evidence presented supporting both positions, the jury was free to accept either one of the positions. *See Logan*, 2013-Ohio-2047, at ¶ 39. Critically, it was well within the province of the jury to grant greater weight to Daniel and Denise's expert witnesses' testimonies over Universal Steel's expert witness testimony. *See id.* Thus, in situations where the evidence is susceptible to more than one construction, we are bound to give the evidence the interpretation that is most favorable to sustaining the verdict and judgment. Therefore, we conclude that the jury did not lose its way by concluding that Universal Steel breached the parties' contract.

{¶182} Universal Steel further contends that the jury's award of $256,500.00 in damages is against the manifest weight of the evidence since the "contract and the jury instructions limited Dues' damages to repair and replacement costs" and the jury's damages award constitutes "rescission-style damages * * * ." (Appellee's/Cross-Appellant's Brief at 19); (Appellee's/Cross-Appellant's Reply Brief at 7). Specifically, Universal Steel contends that the jury lost its way by awarding damages in favor of Daniel and Denise as to their breach-of-contract claim because the "damages amount was not an amount that was presented to the jury by either party." (*Id.* at 17).

{¶183} Daniel and Denise contest Universal Steel's argument and contend that, "[a]s Universal [Steel] admits, [the] Dues' remedy for Universal's breach under the terms of the contact was limited to repair or replacement cost" and the "Dues

presented evidence at trial that the cost of replacing the barn would be $925,000.00."
(Appellant's/Cross-Appellee's Reply Brief at 26). Daniel and Denise assert that
"[t]he Jury's award of $256,500.00 [is] actually at the lower end of potential
damages which could have been imposed upon Universal [Steel] given the evidence
presented at trial." (*Id.*).

**{¶184}** At trial, Daniel and Denise presented evidence to the jury as to the
cost to repair or replace the barn. Specifically, Schnippel testified that the repair
cost of the barn is $163,300.00 and the replacement cost of the barn is $925,000.00.
Similarly, Gutierrez testified that the repair cost (as proposed by Theuret) is
$47,200.00. Thus, even though "the record does not disclose how the jury arrived
at its decision to award" $256,600.00 in damages as to Daniel and Denise's breach-
of-contract counterclaim, "'[t]he fact-finder has the discretion to award damages
within the range of evidence presented at trial, so long as a rational basis exists for
its calculation.'" *Andrew v. Power Marketing Direct, Inc.*, 10th Dist. Franklin No.
11AP-603, 2012-Ohio-4371, ¶ 70, quoting *Sharifi v. Steen Automotive, LLC*, 370
S.W.3d 126, 151 (Tex.Civ.App.2012). Consequently, since the jury's award of
$256,500.00 in damages as to Daniel and Denise's breach-of-contract counterclaim
falls within the range of evidence presented at trial, we conclude that the jury's
damages award is not against the manifest weight of the evidence. *Accord id.*

**{¶185}** For these reasons, Universal Steel's second assignment of error is
overruled.

**Universal Steel's Third Assignment of Error**

**The Trial Court Erred By Granting Dues' Motion For Jury Trial
After Dues Had Agreed To a Contractual Jury Waiver**

**{¶186}** In its third assignment of error, Universal Steel argues that the trial

court erred by granting Daniel and Denise's motion for a jury trial. Specifically,

Universal Steel contends that the parties' contract "contains an express and

enforceable waiver of both parties' right to a jury trial." (Appellee's/Cross-

Appellant's Brief at 20).

*Standard of Review*

**{¶187}** We review a trial court's decision on a motion for a jury trial for an

abuse of discretion. *Am. Hotel Group, LLC v. Wyandotte Plaza, LLC*, 10th Dist.

Franklin No. 16AP-296, 2017-Ohio-5520, ¶ 13. *See also Sallock v. Tillimon*, 6th

Dist. Lucas No. L-22-1241, 2023-Ohio-3193, ¶ 48 (applying the abuse-of-discretion

standard of review to a trial court's decision denying a motion for a jury trial). As

we previously stated, an abuse of discretion connotes a decision that was

unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

*Analysis*

**{¶188}** In this case, Universal Steel contends that the trial court abused its

discretion by granting Daniel and Denise's motion for a jury trial despite their

contractual waiver of their right to request a jury trial. "'Both Article I, Section 5

of the Ohio Constitution and Civ.R. 38(A) provide that the right to a trial by jury is

inviolate.'" *Kane v. Inpatient Med. Services, Inc.*, 9th Dist. Summit No. 29087, 2019-Ohio-1975, ¶ 29, quoting *Princess Kim, L.L.C. v. U.S. Bank, N.A.*, 9th Dist. Summit No. 27401, 2015-Ohio-4472, ¶ 6. "Nonetheless, '[t]he Ohio Supreme Court has recognized that parties may waive the right to a trial by jury without offending the constitutional protection.'" *Id.*, quoting *Princess Kim* at ¶ 9. *See also MidAm Bank v. Dolin*, 6th Dist. Lucas No. L-04-1033, 2005-Ohio-3353, ¶ 123 ("It is well-established a party may waive his or her right to a jury trial by processes other than those provided by the Civil Rules."). Indeed, "the parties to a contract may by prior written agreement waive the right to jury trial." *K.M.C. Co. v. Irving Tr. Co.*, 757 F.2d 752, 755 (6th Cir.1985).

{¶189} "Ohio courts have held contractual jury-waivers, in which the parties agree not to ask for a jury trial, are enforceable where the terms of the waiver are clear and unambiguous." *MidAm Bank* at ¶ 123. Importantly, "[a]s long as circumstances do not indicate that the waiver was entered into unknowingly or involuntarily or that one party had no meaningful choice in the transaction but to agree to the jury waiver, such waivers 'have routinely been upheld by courts in Ohio and elsewhere[.]'" *Princess Kim* at ¶ 9, quoting *Garcia v. Wayne Homes, LLC*, 2d Dist. Clark No. 2001 CA 53, 2002 WL 628619, *10 (Apr. 19, 2002). When determining "whether a jury waiver was entered into knowingly, voluntarily, and intelligently," courts apply "a five-factor test * * * ." *Kane* at ¶ 30.

Under this test, courts consider "(1) the conspicuousness of the provision of the contract; (2) the level of sophistication and experience of the parties entering into the contract; (3) the opportunity to negotiate terms of the contract; (4) the relative bargaining power of each party; and (5) whether the waiving party was represented by counsel."

*Id.*, quoting *Hooper v. Ideal Image Dev. Corp.*, M.D.Florida No. 8:14-CV-2778-T-30EAJ, 2015 WL 1508494, *1 (Apr. 1, 2015). "'No single factor is determinative; rather, the Court must determine whether, in light of all the circumstances, the Court finds the waiver to be unconscionable, contrary to public policy, or simply unfair.'" *Id.*, quoting *Hooper* at *1. The burden of proving that the waiver was not executed knowingly, intelligently, and voluntarily rests with the party challenging the waiver. *Garcia* at *10.

**{¶190}** In this case, the parties' agreement provides, in its relevant part, that "*Buyer and Seller knowingly and intentionally waive any right to trial by jury in regard to this Contract, including its enforcement.*" (Emphasis sic.) (Plaintiff's Ex. 4). After reviewing the parties' agreement, the trial court concluded that Daniel and Denise did not "knowingly, voluntarily, and intelligently" waive their right to request a trial by jury because "the print of [the parties' contract] provision is so small as to be barely legible." (Doc. No. 188).

**{¶191}** Based on our review of the record, we conclude that the trial court did not abuse its discretion by granting Daniel and Denise's motion for a jury trial. That is, we conclude that the trial court did not abuse its discretion by resolving that

Daniel and Denise did not knowingly, intelligently, and voluntarily waive their right to request a jury trial. Importantly, even if the language of the jury-waiver provision is plain and unambiguous (and is emphasized), the trial court did not abuse its discretion by concluding that enforcement of the waiver provision would be unconscionable or simply unfair. Indeed, our review of the parties' agreement reveals that the waiver provision is *not* conspicuous. Critically, this court had difficulty reviewing the provision since it appears in particularly small print and is barely legible. Consequently, the trial court's determination that the parties did not waive their right to request a jury trial is not unreasonable, arbitrary, or unconscionable.

{¶192} Universal Steel's third assignment of error is overruled.

**Universal Steel's Fourth Assignment of Error**

**The Trial Court Erred In Denying Universal's Motion For Attorneys' Fees**

{¶193} In its fourth assignment of error, Universal Steel argues that the trial court abused its discretion by denying its request for attorney fees.

*Standard of Review*

{¶194} "The decision to award attorney fees and the amount thereof are within the discretion of the trial court." *Technical Constr. Specialties, Inc. v. New Era Builders, Inc.*, 9th Dist. Summit No. 25776, 2012-Ohio-1328, ¶ 26, citing *Cassaro v. Cassaro*, 50 Ohio App.2d 368, 373-374 (8th Dist.1976). Therefore, we

review a trial court's determination regarding attorney fees for an abuse of discretion. *Brittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). Again, an abuse of discretion suggests the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

*Analysis*

{¶195} "Attorney fees are generally not recoverable in contract actions." *Technical Constr. Specialties, Inc.* at ¶ 26, citing *First Bank of Marietta v. L.C. Ltd.*, 10th Dist. Franklin No. 99AP-304, 1999 WL 1262058, *8 (Dec. 28, 1999). "Such a principle comports with the 'American Rule' that requires each party involved in litigation to pay its own attorney fees in most circumstances." *Id.*, citing *Sorin v. Bd. of Edn.*, 46 Ohio St.2d 177, 179 (1976). "As exceptions to that rule, recovery of attorney fees may be permitted if (1) a statute creates a duty to pay fees, (2) the losing party has acted in bad faith, or (3) the parties contract to shift fees." *Id.*, citing *McConnell v. Hunt Sports Ents.*, 132 Ohio App.3d 657, 699 (10th Dist.1999), citing *Pegan v. Crawmer*, 79 Ohio St.3d 155, 156 (1997).

{¶196} In this case, the trial court denied Universal Steel's request for attorney fees based on the jury's determination as to Daniel and Denise's breach-of-contract counterclaim. Consequently, based on our determination under Universal Steel's second assignment of error, we conclude that Universal Steel's attorney-fee argument is without merit.

{¶197} Therefore, Universal Steel's fourth assignment of error is overruled.

{¶198} Having found no error prejudicial to the appellee/cross-appellant herein in the particulars assigned and argued in their first, second, third, and fourth assignments of error, we affirm the judgment of the trial court. However, having found error prejudicial to the appellant/cross-appellee herein in the particulars assigned and argued in their first, second, and third assignments of error, we reverse the judgment of the trial court and remand for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part*
*and Cause Remanded*

**WILLAMOWSKI, P.J. and WALDICK, J., concur.**

**/hls**